**2014-1809**

# United States Court of Appeals
# for the Federal Circuit

DISTRIBUTED SOLUTIONS, INC.,

*Appellant,*

*v.*

DEBORAH LEE JAMES, Secretary of the Air Force,

*Appellee.*

*Appeal from the Armed Services Board of Contract Appeals*
*ASBCA No. 57266*
*Administrative Judge Jack Delman,*
*Administrative Judge Mark N. Stempler,*
*Administrative Judge Craig S. Clarke*

**BRIEF OF APPELLANT**

Thomas A. Coulter (VSB No. 46532)
    (D.C. No. 436423)
LeCLAIRRYAN, A Professional
  Corporation
951 East Byrd Street
Richmond, Virginia 23219
Mail:  P.O. Box 2499
Richmond, Virginia  23218
Telephone:    (804) 916-7103
Facsimile:    (804) 916-7203
Email: thomas.coulter@leclairryan.com

Dated:  January 22, 2015

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

DISTRIBUTED SOLUTIONS, INC. v. AIR FORCE

No. 14-1809

## CERTIFICATE OF INTEREST

Counsel for the ~~(petitioner)~~ (appellant) ~~(respondent) (appellee) (amicus)~~ (name of party) _____ Distributed Solutions, Inc. _____ certifies the following (use "None" if applicable; use extra sheets if necessary):

1.     The full name of every party or amicus represented by me is:

    Distributed Solutions, Inc.

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

    Distributed Solutions, Inc.

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

    NONE

4. ☒     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Thomas A. Coulter (Partner), LeClairRyan (appeared in the Armed Services
    Board of Contract Appeals and is appearing in this court)
Stephen M. Faraci (Partner), LeClairRyan (appeared in the Armed Services
    Board of Contract Appeals)

| | |
|---|---|
| _____ September 24, 2014 _____ | _____ /s/ Thomas A. Coulter _____ |
| Date | Signature of Counsel |
| | _____ Thomas A. Coulter _____ |
| | Printed Name of Counsel |

Please Note: All questions must be answered
cc:    All Counsel

i

# TABLE OF CONTENTS

**Pages**

TABLE OF AUTHORITIES ........................................................................ iv

STATEMENT OF RELATED CASES ........................................................ 1

STATEMENT OF JURISDICTION ............................................................ 2

STATEMENT OF THE ISSUES ................................................................ 2

STATEMENT OF THE CASE .................................................................... 3

STATEMENT OF FACTS .......................................................................... 4

    A. Background and Nature of Case ...................................................... 4

    B. The Parties ........................................................................................ 5

    C. The IBPS Contract Prior to DSI's Novation And
       Modification 22 ................................................................................ 7

    D. DSI's Acquisition of IBPS ............................................................ 10

    E. Negotiations Leading to DSI's New Deal with AFNAFPO ........ 12

         1.    DSI'S Proposed Novation Agreement ........................... 16

         2.    AFNAFPO's Counter-Proposal .................................... 19

         3.    The Final Novation Agreement and

               Modification 22 ............................................................. 22

    F. Post-Modification 22 Conduct Confirming the "New Deal" ....... 23

         1.    Modification 28 and Rider C, Attachment 1 ................ 24

         2.    Modification 29 ............................................................. 26

         3.    Proposed Modification 32 ............................................. 28

         4.    AFNAFPO's Decision to Terminate the IBPS
               Contract ........................................................................ 30

5. Delivery Order ............................................................. 31

G. AFNAFPO's Continued, Unauthorized Use of IBPS ................... 35

SUMMARY OF THE ARGUMENT ............................................. 37

STANDARD OF REVIEW ..................................................... 39

ARGUMENT .................................................................. 39

A. General Contract Interpretation Principles ..................................... 40

B. The Board Erred by Failing to Construe Modification 22's Clear, Unambiguous Language Limiting AFNAFPO's Right- to-Use the IBPS Software, Relying Instead on AFNAFPO's Undisclosed Subjective Intention ..................... 43

1. The Circumstances Surrounding the Execution of the Novation Agreement and Modification 22 Confirm that AFNAFPO's Right-to-Use was intended to be limited to the Term of the IBPS Contract ...................... 47

2. The Board Improperly Re-wrote the IBPS Contract to Overcome AFNAFPO's Unilateral Mistake .................. 55

3. The Parties' Subsequent Conduct Confirmed the Limited Duration of AFNAFPO's Right-to-Use the IBPS Software ......................................... 57

C. The Board Erred by Misconstruing the Delivery Order's Clear Language, which provides and Independent Limitation On AFNAFPO's Right-to-Use the IBPS and limits AFNAFPO's Rights to the Duration of the Delivery Order .... 60

CONCLUSION ................................................................ 64

ADDENDUM

CERTIFICATE OF FILING AND SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page**

## CASES

*Alaska Lumber & Pulp Co., Inc. v. Madigan,*
    2 F.3d 389 (Fed. Cir. 1993) ............................................................... 40

*Albano Cleaners, Inc.,*
    455 F.2d 556 (Fed. Cir. 1972) ...................................................... 54, 55

*Andersen Consulting v. U.S.,*
    959 F.2d 929, 934 (Fed. Cir. 1992) ............................................. 53, 55

*Appeal of Anderson-Nichols & Co.,*
    ASBCA No. 6269, 1962 BCA ¶ 3398 (May 23, 1962) ..................... 42

*Appeal of Distributed Solutions, Inc.,*
    ASBCA No. 57266, 14-1 B.C.A. (CCH) ¶ 35704 (Aug. 4, 2014) ...... 3

*Appeal of Fairchild Indus., Inc.,*
    ASBCA No. 16413, 74-1 BCA ¶ 10567 (March 29, 1974) ............. 55

*Appeal of Hughes Moving & Storage, Inc.,*
    ASBCA No. 45346, 98-1 BCA ¶ 29693 (Mar. 31, 1998) ................. 47

*Appeal of Ssangyong Trading Co., Ltd.,*
    ASBCA No. 21614, 79-1 BCA ¶ 13810 (Apr. 13, 1979) ................. 64

*Appeal of Trace Sys., Inc.,*
    ASBCA No. 57574, 11-2 BCA ¶ 34861 (Oct. 20, 2011) ................. 44

*Beta Systems, Inc. v. U.S.,*
    838 F.2d 1179 (Fed. Cir. 1988) ........................................................ 41

*Blinderman Constr. Co., Inc. v. U.S.,*
    39 Fed. Cl. 529 (1997) ...................................................................... 48

*Dana Corp. v. U.S.*,
    200 Ct. Cl. 200 (1972) ....................................................... 55

*George Hyman Constr. Co. v. U.S.*,
    832 F.2d 574 (Fed. Cir. 1987) ........................................... 42

*Granite Constr. Co. v. U.S.*,
    962 F.2d 998 (Fed. Cir. 1992)* ......................................... 41

*HOL-GAR Mfg. Corp. v. U.S.*,
    351 F.2d 972 (Ct. Cl. 1965).......................................... 41, 47

*HPI/GSA 3C, LLC v. Perry*,
    364 F.3d 1327 (Fed. Cir. 2004) ......................................... 45

*Hyde Park Clothes v. U. S.*,
    84 F. Supp. 589 (Ct. Cl. 1949) ......................................... 64

*Jones Construction Company*,
    VABCA No. 929, 70-1 BCA ¶ 8, 267 .............................. 45

*Lockheed Martin IR Imaging Sys. Inc. v. W.*,
    108 F.3d 319 (Fed. Cir. 1997)................................ 40, 41, 45

*Mellon Bank, N.A. v. Aenta Bus. Credit, Inc.*,
    619 F.2d 1001 (3rd Circuit 1980)....................................... 41

*Metric Constructors, Inc. v. NASA*,
    169 F.3d 747 (Fed. Cir. 1999) ...................................... 47, 44

*Minesen Co. v. McHugh*,
    671 F.3d 1332 (Fed. Cir. 2012)........................................... 2

*Nash v. Towne*,
    72 U.S. 689 (1866) ........................................................... 48

*Signal Contracting, Inc. v. Aspin*,
    17 F.3d 1442 (Fed. Cir. 1994) ........................................... 39

*Slattery v. United States,*
    635 F.3d 1298 (Fed. Cir. 2011) ........................................................... 2

*SUFI Network Serv., Inc.,*
    ASBCA No. 55306, 09-1 BCA ¶ 34018 (Nov. 21, 2008) ................. 53

*Turner Const. Co., Inc. v. United States*
    367 F.3d 1319 (Fed. Cir. 2004) ......................................................... 63

*United Int'l Investigative Serv. V. U.S.,*
    109 F.3d 734 (Fed. Cir. 1997) ..................................................... 41, 46

*WPC Enterprises, Inc. v. United States,*
    163 Ct.Cl. 1, 323 F.2d 874 (1963) .................................................... 45

*W. States Constr. Co., Inc. v. United States*,
    26 Cl. Ct. 818 (1992) ....................................................................... 47

## <u>RULES, STATUTES AND OTHER AUTHORITIES</u>

28 U.S.C. §1295(a)(10)...................................................................................... 2

41 U.S.C. § 7107 (2011) ............................................................................. 2, 39

48 C.F.R. § 2.101 .............................................................................................. 5

48 C.F.R. § 42.1204 (h), i(b)(2)...................................................................... 23

11 Williston on Contracts § 31:5 (4th ed.) ............................................... 42, 46

## **STATEMENT OF RELATED CASES**

Pursuant to Federal Rule 47.5, counsel for appellant, Distributed Solutions, Inc. ("DSI"), states that no other appeal in or from the Armed Services Board of Contract Appeals, No. 57266, was previously before this or any other appellate court. To his knowledge, no other appeal will directly affect or be directly affected by this Court's decision in this appeal.

## STATEMENT OF JURISDICTION

Pursuant to the Contract Disputes Act, 41 U.S.C. § 7107 (2011), this Court has jurisdiction to hear this appeal from the final decision rendered by the Armed Services Board of Contract Appeals (the "Board") on both contracts in ASBCA No. 57266. *See* 28 U.S.C. §1295(a)(10); *see also Minesen Co. v. McHugh*, 671 F.3d 1332 (Fed. Cir. 2012) (Bryson, J., dissenting); *Slattery v. United States*, 635 F.3d 1298 (Fed. Cir. 2011).

## STATEMENT OF THE ISSUES

1.    Whether, as a result of the plain language in paragraph 4 of Modification 22 to the parties' contract, the Air Force Non-Appropriated Fund Purchasing Office's ("AFNAFPO") right-to-use the Internet Based Purchasing System ("IBPS") software, which is owned by DSI, was extinguished when contract no. F41999-99-C-0027 (the "IBPS Contract") ended.

2.    Whether the Board erred by failing to construe the plain language in paragraph 4 of Modification 22, choosing instead to rely on AFNAFPO's unexpressed subjective intent to overcome AFNAFPO's unilateral mistake and provide AFNAFPO with a continuing right to use the IBPS software.

3.      Whether the Board erred in ruling that DSI had a duty to advise AFNAFPO of DSI's interpretation of the language in paragraph 4 of Modification 22, which language AFNAFPO proposed to DSI during the course of bilateral negotiations.

4.      Whether the Board erred by ruling that the plain language of Delivery Order F41999-07-F-1375 (the "Delivery Order"), which clearly limited AFNAFPO's rights to use the IBPS software to the term of the Delivery Order, did not extinguish AFNAFPO's right-to-use the IBPS software at the expiry of the Delivery Order term.

## <u>STATEMENT OF THE CASE</u>

This is an appeal from the Board's August 4, 2014 decision, by Administrative Judge Craig S. Clarke, wherein Judge Clarke: (1) ruled, without addressing the plain language of the IBPS Contract, that "DSI failed to disclose that DSI's interpretation of the language in the modifications was that it divested AFNAFPO of its perpetual right to use IBPS;" and (2) misconstrued the Delivery Order, by holding that the phrase "[d]uring the term of the Agreement" did not limit AFNAFPO's right to use the IBPS Software to the term of the Delivery Order.  *See* Appeal of Distributed Solutions, Inc., ASBCA No. 57266, 14-1 B.C.A. (CCH) ¶ 35704 (Aug. 4, 2014).

# STATEMENT OF FACTS

### A.     Background and Nature of Case

In August 2005, AFNAFPO was facing the likely termination of the IBPS, because its version of the IBPS did not meet newly imposed data security requirements.  AFNAFPO urgently needed a contractor to step into the IBPS Contract (a contract for the completion, enhancement, and maintenance of the IBPS software) to create a new, major version to meet those data security protocols, among other improvements.  DSI had purchased the rights to the IBPS software from AFNAFPO's prior contractor, but had no obligation to take over or step into the IBPS Contract.  AFNAFPO's only hope to keep the IBPS available to its users was convincing DSI to take over the IBPS project and create the new, major version AFNAFPO needed.  Against this backdrop, the parties agreed to a new deal whereby DSI would complete a new, major version of the IBPS in exchange for changes to certain rights, duties, and obligations existing under the IBPS Contract.  The Board erred by failing to construe the clear, unambiguous language in paragraph 4 of Modification 22, which limited AFNAFPO's right-to-use the IBPS to "the life of the" IBPS Contract.  Instead, the Board re-wrote the IBPS Contract, contrary to established legal principles, to relieve AFNAFPO from a perceived "bad bargain" as a result

of language drafted by AFNAFPO.  Further, the Board failed to construe the

plain language of the Delivery Order, as drafted by DSI, containing the

same, clear limitation of AFNAFPO's right-to-use the IBPS.

### B.     The Parties

DSI is a small business software developer and manufacturer and an

experienced federal government contractor.  JA370, line 25 through JA374,

line 18.[1]  DSI has been very successful selling Commercial-Off-The-Shelf

("COTS")[2] software products to federal government entities.  JA372, line 21

through JA374, line 18.  In particular, DSI's software products automate the

federal government acquisition process.  JA374, line 22 through JA378, line

6.  DSI's President, Daniel Carr, has over 20 years of experience in software

development, software rights, licensing, and federal government contracting.

JA361, line 9 through JA371, line 5.  Peter Tuttle, DSI's Senior Contracts

Administrator from 2004-2007, was responsible for negotiating DSI's

novation agreement and the contemporaneous Modification 22, as well as

other important contract documents.  JA427, line15 through JA435, line 19.

---

[1] "JA ____" refers to citations to the Joint Appendix.

[2] A "COTS" item "[m]eans any item of supply (including construction material) that is (i) A commercial item …; (ii) Sold in substantial quantities in the commercial marketplace; and (iii) Offered to the Government, under a contract or subcontract at any tier, without modification, in the same form in which it is sold in the commercial marketplace…."  48 C.F.R. § 2.101.

Mr. Tuttle has over 20 years of experience in contract administration and federal government contracting. *Id.*

AFNAFPO is the servicing contracting office for Air Force Nonappropriated Fund Instrumentalities ("NAFIs") worldwide. NAFIs are responsible for morale, welfare, and recreation activities such as golf courses, bowling alleys, child development and youth centers, food services, and leisure travel offices. JA131, ¶ 2; JA551, lines 9-11. AFNAFPO had a number of senior, warranted contracting officers and senior program managers who were involved in the administration of the IBPS Contract, including Janice Jones,[3] Jimmy Sawyer,[4] Cedric Henson,[5] and Max

---

[3] Janice Jones is the deputy chief of AFNAFPO. Ms. Jones reports directly to William Foran, the Division Chief (formerly the Director). JA481, line 6 through JA491, line 4. Ms. Jones has held this position of significant authority (i.e., Deputy Director or Deputy Chief) since 2004. *Id.* Prior to her time as Deputy Director/Deputy Chief, Ms. Jones served as the IBPS Project Team Lead and as Branch Chief of the Policies and Procedures Branch, which included the IBPS. *Id.; see* JA7, ¶ 14. At all times relevant to this matter, Ms. Jones was a warranted contracting officer. *Id.*

[4] Jimmy Sawyer is the AFNAFPO Contracting Officer who negotiated and executed Modification 15. JA751-752.

[5] Cedric Henson is currently a supervisory contract specialist at AFNAFPO. JA522, line 21 through JA573, line 17. During the relevant time period, Mr. Henson was a warranted contracting officer and the Branch Chief of the Business Systems Branch at AFNAFPO, which was responsible for administering AFNAFPO's computer hardware and software contracts, including the IBPS Contract, among other things. *Id.; see* JA7, ¶ 15.

Browning.[6]  In addition, Diana Runkle, the IBPS Program Manager, was

also involved with the IBPS, but her involvement was primarily on the

software, technical, or application side of the IBPS.  JA515, line 8 through

JA519, line 12.

### C.    The IBPS Contract Prior to DSI's Novation and Modification 22

Development of the IBPS initially began in 1997, after the award of

delivery order no. F41999-97-F-6019 to GCG Computers.  JA2, ¶ 1; JA664-

671, 1127-1133.  GCG's involvement in the project was short-lived, and by

1999, AFNAFPO awarded a new contract (no. F41999-99-C-0027) for the

completion, enhancement and further development of the IBPS to Judd's

Online, GCG's original subcontractor.  JA573-620; JA507, lines 5-9 and

JA508, lines 5-12.  JA4, ¶ 5.

From 1999-2005, there were several novations and/or name changes,

eventually resulting in AFNAFPO having a contractual relationship with

Susquehanna Technologies, Inc. ("SusQTech").  JA4, ¶¶ 7-8; JA630-659

and 660-663; JA623-629.

---

[6] Max Browning is currently the Branch Chief for Food and Beverage, Food
Transformation, Facilities Inspection, and Lodging.  JA552, lines 3-16.
During the relevant time period, Mr. Browning was a warranted contracting
officer in the Business Systems Branch and responsible, in part, for
administration of the IBPS Contract.  JA552, lines 3-16, and JA553, lines
18-23; *see* JA15, ¶ 30 - JA21, ¶ 39.

Beginning in late 2003, SusQTech and AFNAFPO began talking about the parties' respective rights and obligations with respect to intellectual property and escrow of software source code, which rights and obligations were not stated in the IBPS Contract.  JA748-749.  Over the course of the next year, AFNAFPO and SusQTech negotiated and eventually executed Modification 15, which generally addressed 3 areas:

- AFNAFPO's right-to-use the IBPS software in the operation of AFNAFPO's eProcurement system.[7]

- The contractor's obligation to escrow software source code over the life of the IBPS Contract and the circumstances under which AFNAFPO could retrieve source code from escrow.

- AFNAFPO's duties to protect and defend the contractor's ownership of the IBPS.  JA751-752.

JA5-6, ¶¶ 9-12.  Modification 15 was the first time that ownership, rights-to-use, or escrow were addressed in the IBPS Contract.  JA705.

Per Modification 15, AFNAFPO could only use the IBPS software (a COTS product) in the operation of its eProcurement system on a "continuous and non-exclusive" basis.  JA751-752.  Periodically, as the IBPS was enhanced and additional functionality was added, a major upgrade would be

---

[7] Modification 15 did not provide a license.  Instead, it provided a contractual right-to-use the IBPS.  *See* JA511, line 25 through JA513, line 6 (Ms. Runkle noting that any language related to a "license" was removed from the final agreed-upon language.).

released, with each release bearing a later sequential number.  JA509, line 10

through JA510, line 14.  In early 2005, around the time that SusQTech and

AFNAFPO entered into Modification 15, Release 3 was in operation and

SusQTech was working on Release 4.  Release 4 required brand new

technology, moving the IBPS from the .asp platform to the .net platform.[8]

JA509, lines 13-19.  In addition to using new technology, Release 4 also was

critical to AFNAFPO's ability to meet new internet security requirements

that recently had been imposed by the Air Force.  JA492, line 2 through

JA495, line 25.  Release 3 did not meet the new security requirements and

by March of 2005, AFNAFPO was operating under a temporary authority to

operate, which was set to expire in November 2005.  *Id.*

Originally, SusQTech was scheduled to deliver Release 4 around

March 2005, but SusQTech suffered numerous delays and missed its original

---

[8] An AFNAFPO failure to move to the current technology platform (.net) would mean that the IBPS would eventually cease to function.  Specifically, Microsoft would no longer support the older .asp technology.  Over time, the IBPS would no longer be an agile and functioning system, able to work with newer Internet browser technology; and immediately, would not be in compliance with Federally mandated system requirements and security protocols.  *See infra*, p. 48-49, including the JA citations.  Additionally, this change was quite significant – both in technology and program cost(s) savings as it moved IBPS from a local client-server configuration to a centralized server supported environment, where all AFNAFPO internal users would have the ability to access the most current systems and data for continued mission-goal success.

9

deadline.  Sometime in June or July 2005, SusQTech advised AFNAFPO that it was seeking a buyer for its assets and would not be able to continue performing under the IBPS Contract.  JA496, line 1 through JA497, line 1. Thus, AFNAFPO learned that SusQTech, who had not yet delivered Release 4, would never deliver Release 4.  JA721, lines 22-25.

AFNAFPO was keenly aware in June or July of 2005 that the IBPS would be removed from the Air Force internet, and the IBPS program would be cancelled, if Release 4 was not complete and deployed by the November 2005 "drop dead" date.  JA493, line 25 through JA494, line 21 and JA497, line 2 through JA499, line 22.  If the IBPS was removed from the Air Force internet, no field users would be able to use the IBPS.  JA495, lines 18-21. In other words, field users would have no ability to make their many purchases on a daily basis, and AFNAFPO would fail to provide its users with one of its most basic services.

At the same time that AFNAFPO was recognizing that it faced a major obstacle in keeping the IBPS available to its field users, DSI began negotiations to purchase the IBPS software from SusQTech.

### D.    DSI's Acquisition of IBPS

At the start of DSI's negotiations with SusQTech, DSI was only interested in purchasing the IBPS software.  JA395, line 11 through JA396,

line 17; JA398, line 19 through JA399, line 7.  DSI saw a potential synergy

between the IBPS and its own line of COTS products because the IBPS

software had a requisitioning component that DSI had not yet created for its

own COTS products.  JA396, line 18 through JA397, line 6.

On July 29, 2005, DSI and SusQTech entered into an Asset Purchase

Agreement, whereby DSI purchased:

> All right, title and interest in and to ***the
> Intellectual Property owned by [SusQTech]
> produced as part of AFNAFPO Project (the
> "Project"), including but not limited to the
> Source Code(s), Object Code(s)*** and all patents
> and copyrights whether statutory or common law
> as they may exist, Executables, Supporting
> Utilities, Supporting hardware and software
> (collectively the "Infrastructure Elements"),
> Customer Support XtraNet and underlying data,
> files, Artifacts, Deliverables, all historical data
> related to the Project, and all licenses related to the
> Project (all of the items referred in this paragraph
> "2A" are referred to collectively as the
> "Intellectual Property").[9]

JA8, ¶ 17; JA780 (emphasis added).  As a part of the deal, SusQTech

affirmatively represented that it had "good and marketable title to all

Purchased Assets, whether tangible or intangible," and it agreed to transfer

---

[9] DSI also purchased "[a]ll or some of the contract rights in and to that certain contract(s) between [AFNAFPO] and [SusQTech] for development of an [IBPS]…"  JA780.  Pursuant to this section of the Asset Purchase Agreement, DSI was entitled to any contract receivables earned by SusQTech but not yet paid.  JA401, lines 17-23.

to DSI "good and merchantable title to all Purchased Assets, *free and clear of all liens, encumbrances and liabilities* of any nature whatsoever…." JA782.  Therefore, as a result of DSI's purchase the IBPS software, DSI became the sole owner of the IBPS with no restrictions on its ownership.  *Id.*

### E.    Negotiations Leading to DSI's New Deal With AFNAFPO

In July 2005, DSI also began exploring the possibility of novating into the IBPS Contract.  JA404, line 7 through JA405, line 2.  DSI did not need to novate into the IBPS Contract to make the purchase of the IBPS assets worthwhile because the IBPS assets had value in expanding DSI's COTS offerings.  JA396, line 18 through JA397, line 6; JA402, line 6 through JA403, line 23; and JA404, line 7 through JA405, line 2.   However, DSI saw an opportunity to gain a long-term customer (AFNAFPO) and possibly use the IBPS Contract as a new business opportunity to expand into the DoD market.  JA399, line 8 through JA400, line 24 and JA404, line 3-24; *see also* JA810.

In reviewing the IBPS Contract, DSI wanted to determine, among other things, whether AFNAFPO's right-to-use and DSI's obligations were

"bound by the contract"[10] and identify conditions that were different from

DSI's standard language or conditions.  *See* JA8, ¶ 18; JA436, line 24

through JA437, line 17; JA753; 765-767.  Upon its initial review, DSI

concluded that AFNAFPO's right-to-use the IBPS software was limited to

the term of the IBPS Contract because of the absence of any language

denoting "perpetual" rights.  *Id.;* JA439, line 13 through JA442, line 6.

However, Mr. Tuttle subsequently learned that both SusQTech and

AFNAFPO understood Modification 15's grant of "continuous" rights to

provide broader rights than what was memorialized in Modification 15's

language.  *Id.; see also* JA744-747; *see* JA9, ¶ 19.  Specifically, SusQTech

and AFNAFPO viewed the term "continuous"[11] to be synonymous with the

industry-accepted term "perpetual." *Id.*  While the potential that AFNAFPO

may have a perpetual right-to-use was an unacceptable risk to DSI that

needed to be addressed in negotiations, Mr. Stock's communication

provided comfort that DSI was purchasing a COTS product owned by a

commercial company.  JA442, lines 7-15.  Specifically, Mr. Stock explained

---

[10] Mr. Tuttle, DSI's Senior Contract Administrator at the relevant time period, explained that to DSI being "bound by the contract" meant that rights or obligations would not "go beyond the contract['s]" period of performance."  *See* JA8, ¶ 18; JA437, line 18 through JA438, line 8.

[11] "Continuous" has no accepted meaning in the industry.  JA415, line 4-16.

that "AFNAFPO has long held the belief that SusQTech and its predecessors owned the IBPS intellectual property."[12]  JA9, ¶ 19; JA744-747.

On July 26, 2005, DSI began the negotiation process by meeting with senior members of AFNAFPO's management team, including Col. Madigan, AFNAFPO's Director at the time; Janice Jones, AFNAFPO's Deputy Director at the time; and Jimmy Sawyer, AFNAFPO's Policy, Procedures, and Training Branch Chief.  JA768-769.  The purpose of the meeting was to introduce DSI to AFNAFPO, explain DSI's approach to COTS implementations and custom implementations, and also to explain a number of risks in the AFNAFPO project that DSI had identified.  *Id.*; *see also* JA791-812.[13]  Importantly, DSI "emphasized that [the AFNAFPO project] is a non-revenue generating program at this time and that DSI was taking on a substantial risk."  JA768-769.  In addition, DSI specifically noted that it was looking for ways to "cap [its] investment risk."  *Id.* JA810.  Of course, one

---

[12] This view of the IBPS as a COTS product was entirely consistent with the underlying contract documents.  Indeed, AFNAFPO's original Statement of Work noted it was seeking to obtain "customized software or existing off-the-shelf software that will be modified" to meet AFNAFPO's needs. JA691-743.  In the original proposal submitted by Judd's Online, as subcontractor for GCG Computers, Judd's Online proposed the development of a software system that would interface with and utilize existing Microsoft COTS products.  JA672-690.

[13] Mr. Tuttle explained that the Powerpoint presentation in Appellant's Second Supplemental Rule 4 214 (DSI_00006348-6369) was presented by Ken Hamer, Tom Strimple, and Robert Sheahan at the July 26, 2005 meeting.  JA791-812.

14

of the ways to cap its investment risk was to insure that AFNAFPO's right-to-use DSI's intellectual property embedded in the IBPS was limited to the term of the IBPS Contract.  JA412, line 17 through JA414, line 11; JA440, line 18 through JA442, line 18.

On August 11, 2005, during the negotiation process, DSI was told by Ms. Jones that the IBPS program was going to be cancelled.  JA670-671. Only through DSI's intervention, and strong command of the needed changes to IBPS, did Col. Madigan, AFNAFPO's Director, change his mind and agree to move forward with the IBPS.  JA859-861.  Indeed, DSI later learned from Ms. Jones that DSI's involvement – even though the novation process was not yet finalized – "made all the difference."  *Id.*

Also on August 11, 2005, Mr. Tuttle, of DSI, forwarded a novation request package to Cedric Henson, the AFNAFPO warranted Contracting Officer responsible for the novation process.[14]  JA772-812.  The novation request package included: (1) DSI's proposed novation agreement; (2) a copy of the DSI/SusQTech Asset Purchase Agreement;[15] and (3) a copy of

---

[14] With respect to Mr. Henson's authority, *see generally* JA443, line 15 through JA444,  line 3; JA532, lines 4-16.  In addition, the novation request package was also separately sent by Ken Hamer, of DSI, to Janice Jones, AFNAFPO's Deputy Director.  *See* JA813-858.

[15] As early as July 26, 2005, AFNAFPO advised DSI that it needed to provide a copy of its Asset Purchase Agreement so that AFNAFPO could insure that DSI owned the IBPS.  JA769; JA449, lines 3-22.

the DSI PowerPoint presentation that was presented at the DSI/AFNAFPO

July 26, 2005 meeting. *Id.*

### 1.    *DSI's Proposed Novation Agreement*

DSI's proposed novation agreement, dated August 9, 2005, stated the

terms and conditions under which DSI was willing to novate into the IBPS

Contract. JA10, ¶ 21; JA774-777. DSI offered AFNAFPO what it

considered to be an acceptable business deal. DSI was not going to simply

step into SusQTech's shoes. *See* JA8, ¶ 18; JA409, line 22 through JA411,

line 3. DSI's proposed novation agreement explicitly stated which

modifications DSI expected to be a part of any deal going forward and

which modifications it was proposing be closed or ended, such as

Modification 15:[16]

> Modifications M01 through M0007, M0009,
> M0010, (FY04 maintenance portion), M0011,
> ***M0015***, M0019 and M0020 ***are complete and
> accepted by the Government***.

JA10, ¶ 21; JA774, ¶(a)(1). This language in paragraph (a)(1) made clear

that DSI was only willing to step into the IBPS Contract if the parties had no

further expectations or obligations under the stated modifications, including

---

[16] In its proposed novation agreement, DSI explicitly stated that it was
intending to modify the terms of the IBPS Contract. *See* JA10, ¶ 21; JA776.
AFNAFPO understood that DSI's novation request package (JA774-777)
was intended to change terms in the existing IBPS Contract. *See* JA11-12,
¶¶ 22-23; JA527, line 25 through JA530, line 12; JA531, lines 5-11.

Modification 15.  *See* JA10, ¶ 21; JA445, line 12 through JA446, line 9.

This language sought to eliminate any "perpetual" right-to-use AFNAFPO

may have had under the existing IBPS Contract.  *Id.; see also* JA447, line 1

through JA448, line 9.  Importantly, that is exactly how Janice Jones,

AFNAFPO's Deputy Director, understood paragraph (a)(1) of DSI's

proposed novation agreement:

> **We were concerned that if they said that**
> **[Modification 15] was closed that they [DSI]**
> **would be taking away what we [AFNAFPO] had**
> **just put into Mod 15, which gave us the right to**
> **use IBPS software**.

*See* JA12, ¶ 23; JA501, line 25 through JA502, line 13.[17]

Ms. Jones was integrally involved in the novation process.  While Mr.

Henson was the contracting officer responsible for negotiating directly with

DSI, AFNAFPO used a senior management team approach to reviewing and

negotiating the DSI novation because Mr. Henson had been away from the

---

[17] Janice Jones was called as an adverse witness by DSI in its case in chief. When Ms. Jones was asked whether she understood that DSI's proposed novation agreement sought to curtail rights and duties listed under Modification 15, she initially testified that she did not gain that impression. JA500 lines 7-10.  When reminded, however, that she had given unequivocal testimony to the contrary at her May 1, 2005 deposition, Ms. Jones affirmed the accuracy of her deposition testimony.  JA500, line 7 through JA502, line 13.  Moreover, in response to her own counsel's questioning, Ms. Jones once again confirmed that after receiving DSI's proposed novation agreement, she and others at AFNAFPO were concerned about AFNAFPO's ability "to continue to use IBPS."  *See* JA12, ¶ 23; JA503, line 20 through JA504, line 5; JA505, lines 12-20.

IBPS Contract for some period of time.[18]  JA526, lines 3-22; JA525, lines 12-23.  Ms. Jones and Mr. Sawyer, both of whom had been consistently involved in IBPS from at least 1999 through August 2005, provided guidance and input to Mr. Henson during the novation process, including sharing concerns about the language in DSI's proposed novation agreement.

Mr. Henson explained that when he received DSI's proposed novation agreement, he reviewed the IBPS Contract, including all modifications that had been executed through the date on which the novation request package was received.  JA532, line 17 through JA533, line 8.  Then, he caucused with Ms. Jones and Mr. Sawyer to discuss AFNAFPO's collective concerns.  *See* JA11, ¶ 22, JA12, ¶ 23; JA862-865.[19]  Eventually, this team of three AFNAFPO senior, warranted contracting officers – two of whom had been consistently involved with IBPS for the preceding 6 years – jointly drafted response language that eventually was incorporated into AFNAFPO's counter-proposal.  JA542, line 9 through JA543, line 15.

---

[18] There was a concern within AFNAFPO at the time that the program side (i.e., individuals responsible for the application or software itself) may not have the objectivity necessary to conduct the negotiations.  *Id. at* JA525, line 24 through JA526, line 16.

[19] Appellant's Second Supplemental Rule 4 Exhibits 221 and 222 are internal AFNAFPO documents that were never shared with DSI in 2005. Nor did anyone at AFNAFPO ever share the concerns stated in those documents with anyone at DSI.  JA540, line 13 through JA541, line 25.

## 2.   *AFNAFPO's Counter-Proposal*

On August 26, 2005, after review and approval by AFNAFPO's senior contract, program, and legal teams, AFNAFPO e-mailed a counter proposal to DSI's proposed novation agreement.  *See* JA12, ¶ 24; JA866 ("In light of legal concerns from our counsel, the Air Force would like to make a counter proposal to your Novation Agreement dated 9 August.").  In its counter proposal, AFNAFPO proposed that DSI sign a novation agreement "as written in the Federal Acquisition Regulation (FAR) along with a contract modification addressing [DSI's] concerns that precipitated the changes made to the Novation agreement."  *Id.; see* JA12, ¶  24; JA13, ¶ 25.

In addition, Mr. Henson's e-mail included AFNAFPO's proposed language to be included in a contemporaneous contract modification.  *See* JA12, ¶ 24; JA868; JA543, lines 7-20.  At the top of the page containing AFNAFPO's proposed contract language, it states:  "The purpose of this modification is to acknowledge ***and agree to terms*** concerning execution of contract modifications 0008 through 0021."  JA4868. (emphasis added).  In other words, the purpose of the proposed contract language was to clearly state "what the deal is going forward" between DSI and AFNAFPO.  JA450, lines 21-230.

19

In paragraph 4 of the document containing AFNAFPO's proposed contract language (DSI_00001921), AFNAFPO proposed the following with respect to Modification 15:

> 4. Modification M0015 shall remain in effect but will be changed to reflect DSI in lieu of "Susquehanna Technologies". This modification [Modification 15][20] **_is valid for the entire life of the contract_**[21] and will not be considered complete until the contract is closed.[22]

*See* JA12, ¶ 24; JA868; *see also* JA13, ¶ 27 (emphasis added).

When Mr. Tuttle received AFNAFPO's proposal in paragraph 4 of DSI_00001921, he understood AFNAFPO to be proposing that any rights, duties, and/or obligations stated in Modification 15 would remain outstanding for the period of performance of the IBPS Contract, but that any right-to-use the IBPS, any right-to-access source code, and any obligation to escrow source code would end with the expiration of the IBPS Contract. *See* JA13, ¶ 25; JA451, line 2 through JA452, line 13; *see also* JA521-A, line 21

---

[20] Mr. Henson, one of the drafters of DSI_00001921, testified that "[t]his modification" as used in the second sentence of paragraph 4 referred to Modification 15. JA544, lines 3-5.

[21] Mr. Henson, one of the drafters of DSI_00001921, testified that "valid for the entire life of the contract" refers to the period of performance under the IBPS Contract. JA544, lines 6-9.

[22] The last clause of paragraph 4 (proposing that Modification 15 "will not be considered complete until the contract is closed") directly responded to DSI's proposed novation agreement wherein DSI proposed that Modification 15 would be complete and accepted by the Government before the novation. *Compare* JA772-812 and JA866-877.

through JA521-B, line 1.  (Ms. Runkle confirming that she understood

AFNAFPO's proposed language to mean that Modification 15 would be

complete when AFNAFPO was no longer under contract with DSI).  A

comparison of DSI's original language (JA772-812) side-by-side with

AFNAFPO's counterproposal (JA866-877) is reproduced below.



From August 26, 2005 through September 30, 2005, DSI and

AFNAFPO continued to negotiate the language that was to be included in

the novation agreement and the proposed contract modification.  *See*

generally JA13; JA866-877; JA1137-1174; JA453, line 5 through JA454,

Line 8.  For example, on August 31, 2005, DSI requested certain revisions,

which were accepted by AFNAFPO, that tied the novation agreement and

the contract modification together.  JA227 (DSI_00006994) ("[s]ubject to

the terms, conditions and limitations as agreed to in Modification

M022….").  Despite a month of additional negotiations, no changes or

revisions were made to AFNAFPO's proposed language in paragraph 4 of

Modification 22.  *Compare* JA868 and JA879.

### 3.  The Final Novation Agreement and Modification 22

In early October 2005, DSI and AFNAFPO finalized the novation

agreement and the contemporaneously executed Modification 22.  *See* JA14,

¶ 28.  The novation agreement, dated September 30, 2005, is expressly

"[s]ubject to the terms, conditions and limitations as agreed to in

Modification M022."  JA547, lines 4-12.  Block 14 of Modification 22 (Page

104) states:

> 1.  The purpose of this modification is to recognize
> Distributed Solutions Inc. as the successor
> contractor (See attached Novation Agreement) ___**and**___
> ___**agree to terms concerning execution of contract**___
> ___**modifications 008 through 0021**___ (See pages 2 and
> 3 of modification).

*Id.*  JA878; *see* JA13, ¶ 27.  Modification 22 represented a new and distinct

deal.  It clearly outlined the parties' expectations and identified the precise

terms and conditions under which DSI and AFNAFPO's rights and

obligations would be determined.  JA547,  lines 4-12.  Any doubt that

Modification 22 outlined a new deal is removed by reference to paragraph 12:

> 12. ***DSI's liabilities and obligations are limited to the requirements set forth in this Modification M022***. DSI shall have no liability or obligation for any claims and demands under contract F41999-99-C-0027 [the IBPS Contract] arising prior to the effective date of this modification. This limitation shall not apply to any future obligation or liability under said contract as modified by Modification M0022.

*See* JA14, ¶ 28; JA880; *see also* JA455, line 19 through JA456, line 11.

Indeed, Paragraph 12 clearly provides that DSI was starting fresh with a new deal, unlike the provisions found in the standard form novation agreement in the FAR, which requires a successor to remain liable for the predecessor's conduct and take on any pre-existing liabilities.[23] *Compare* JA878-882 and JA628-629; *see* 48 C.F.R. § 42.1204(h), (i)(b)(2).

### F.     Post-Modification 22 Conduct Confirming the "New Deal"

After DSI and AFNAFPO executed the Novation Agreement and Modification 22, the parties performed under the IBPS Contract. Several subsequent contract modifications confirmed that under the IBPS Contract,

---

[23]   While the novation agreement generally followed the format outlined in the FAR, that format was not required, as the FAR and DFARS do not apply to NAFIs such as AFNAFPO, and the parties did not strictly adhere to it as evidenced by the agreed alterations to the FAR format, as proposed by DSI, including tying Modification 22 to the novation agreement and eliminating liability for prior contractors' actions/obligations.

as modified by Modification 22, AFNAFPO's right-to-use the IBPS were limited to the duration of the IBPS Contract.

### 1. *Modification 28 and Rider C, Amendment 1*

By July 2006, Max Browning, a warranted contracting officer with AFNAFPO, became DSI's primary AFNAFPO contact for contract issues. JA457, line 12 through JA458, line 1; JA885-911. On July 26, 2006, Mr. Tuttle forwarded an Executed Registered Beneficiary Addition Form (sometimes called "Rider C") to DSI's existing Escrow Agreement. JA885-911. Rider C is a supplemental form used to add additional beneficiaries to DSI's existing escrow arrangement with Escrow Associates. JA458, lines 15-23. *See* JA15, ¶ 31. Paragraph 2 of the executed Rider C stated that DSI's "sole ownership of IBPS" and AFNAFPO's "Right-to-Use are per AFNAFPO Contract F41999-99-C-0027, Modification M0015 *as modified by Modification M0022*." JA910 (emphasis added).

Upon receipt of Rider C, Mr. Browning raised a number of concerns with the document and requested specific changes. JA16, ¶ 32; JA912-932. On August 7, 2006, Mr. Tuttle forwarded to Mr. Browning an amended Rider C addressing Mr. Browning's specific concerns, to which Mr. Browning agreed. *See* JA16, ¶ 33; JA459, line 21 through JA459, line 2;

JA933-956.  Thereafter, the parties incorporated Rider C into the IBPS

Contract through Modification 28.[24]  JA654-659.

Rider C, Amendment 1 includes the following important provisions

confirming AFNAFPO's limited right-to-use the IBPS (including any

software source code retrieved from escrow):

> 2.  [DSI'S] sole ownership of IBPS and [AFNAFPO's] Right-to-Use are per AFNAFPO Contract F41999-99-C-0027, Modification 15 **_as modified by_** Modification M0022.
>
> ****
>
> 6.  Paragraph 8 [of DSI's Two-Party (Master) Escrow Agreement (JA917 - 925 (DSI_00003690-3698)] "Release of Deposit Materials", subparagraph (e) **_"Restrictions on Use"_**, subparagraph (iii) is revised to read "(iii) **_[AFNAFPO] agrees to use the Deposit Materials_** under carefully controlled conditions in accordance with, and for the purposes of, this Agreement and **_solely in conjunction with the terms and conditions of AFNAFPO Contract F41999-99-C-0027, Modification M0015 as modified by Modification M0022_**;".

---

[24] When AFNAFPO prepared Modification 28, it attached the original Rider C to Modification 28.  The parties stipulate and agree that Rider C, Amendment 1 should be attached to Modification 28.  JA466, line 22 through JA467, line 3.  In any event, Rider C, Amendment 1, which was negotiated by DSI and AFNAFPO, provides on its face that "Amendment 0001 takes precedence over any previous versions of this Rider C document."  JA939; *see also* JA134, ¶ 14.

JA939-940. (emphasis added); JA461, line 18 through JA465, line 14*; see*

*JA16*, ¶ 33. Paragraph 6 of Rider C, Amendment 1 specifically tied the use

of any source code retrieved from escrow to the limited right-to-use stated in

Modification 22. In doing so, DSI insured that the right to access source

code could not be viewed as granting an implied right to use that source

code in a manner inconsistent with the limited right-to-use stated in

Modification 22.

### 2. *Modification 29*

On September 29, 2006, Mr. Browning forwarded a draft modification

to Mr. Tuttle memorializing a number of agreements reached at a July 2006

meeting between the parties, including a one year contract extension. *See*

JA15, ¶ 30; JA883-884, 957-965. On October 11, 2006, Mr. Tuttle

forwarded suggested revisions to the draft modification to Cedric Henson,

who was handling contract administration duties while Mr. Browning was

out of town. JA467, line 17 through JA468, line 13. DSI's revisions sought

to, among other things, "ensure **the continuation of rights** and

responsibilities regarding DSI's Intellectual Property Ownership,

***AFNAFPO's Right-to-Use***, [and] responsibilities of the Parties and

Escrow." *Id.;* JA964. DSI's proposed revisions also included the following

paragraphs:

### 9)  Intellectual Property Ownership, Right-to-Use and Escrow

*The rights and responsibilities of the Parties in regards to intellectual property ownership, right-to-use and escrow in Modifications M0015 and M0022 remain in full force.*

### 10)  Release of Claims

*The Parties hereby remise, release, and discharge the other Party, its officers, agents, and employees of and from all liabilities, obligations, claims and demands whatsoever under or arising for Contract No. F41999-99-C-0027, except as detailed in this Modification Mod M0029 including attachments.*

*Id.* JA965; *see* JA15, ¶ 30. (emphasis in original).  Absent the inclusion of paragraph 9, the release of claims in paragraph 10 would have ended AFNAFPO's right-to-use IBPS and DSI's obligation to escrow software source code.  JA468, line 22 through JA470, line 20.

DSI's proposed revisions were reviewed and vetted by four senior AFNAFPO Contracting Officers:  Mr. Henson, Mr. Browning, Mr. Sawyer, and Ms. Jones.  JA1175-1179.  After the collective AFNAFPO review, AFNAFPO made "some minor changes" to the proposed modification language, but it left DSI's changes concerning the right-to-use and escrow intact.  JA966-970; JA470, line 21 through JA471, line 14.  After some additional negotiation between the parties, DSI and AFNAFPO agreed on a

27

final version of Modification 29, which then became a part of the IBPS

Contract.  JA971-1011.  AFNAFPO never objected during the Modification

29 negotiations to the inclusion of Paragraph 9, which noted that

AFNAFPO's right-to-use would only continue during the contract period

and that its right-to-use was otherwise limited by Modification 22.  JA378,

line 22 through JA379, line 7.  Paragraph 9 of Modification 29 became part

of the IBPS Contract when Ms. Jones executed the modification on October

19, 2006.  JA996-1015; JA471-A, lines 6-21.

### 3.    *Proposed Modification 32*

In May 2007, the parties discussed a proposed modification to extend

the IBPS Contract until April 2008.  JA1016.  As a part of those

negotiations, Mr. Tuttle wrote Mr. Browning on May 23, 2007 and

suggested that certain Modifications be specifically excepted from the

proposed mutual release of claims.  *Id.*  Specifically, Mr. Tuttle wrote:

> 2.  Para 8.  "The parties hereby remise, release, and
> discharge the other Party, its officers, agents and
> employees of and from all liabilities, obligations,
> claims and demands whatsoever under or arising
> for [sic] Contract No. F41999-99-C-0027 (T)
> except as follows:
>
> Modification M0015 Intellectual Property Rights
> Modification M0022, Novation – DSI named
> Successor

> Modification M0029, FY 2007 Maintenance,
> Escrow and other agreements Modification M031,
> NAF-T Enhancement, and
> Modification M0032 as detailed in the
> Modification including attachments."
>
> Rationale for the proposed revisions: ***Mods 15 &
> 22 continuance of rights and responsibilities for
> both parties*** ….

*Id.* JA1016 (emphasis added).  While proposed Modification 32 was never

executed by the parties, the negotiations concerning Modification 32 once

again reminded AFNAFPO of its limited right-to-use under Modification 22.

JA472, line 23 through JA473, line 9; *see* also JA1021-1022 and JA474, line

25 through JA476, line 7.  Indeed, proposed Modification 32 was eventually

intended to be a close-out modification after AFNAFPO decided to

terminate the IBPS Contract.  DSI clearly indicated that AFNAFPO's right-

to-use under Modification 22 would not continue if Modification 32 was

executed.  On September 5, 2007, Mr. Tuttle wrote Mr. Browning,

explaining that DSI could not agree to AFNAFPO's proposed Modification

32, including the proposed release of claims contained therein.  Mr. Tuttle

wrote:

> 6) AFNAFPO para 5) Release of Claims.  DSI
> proposes that Modification specifically mentions
> that the following be exempted, and therefore
> survive, from any release of claims language:

29

- Duties of the parties in regards to
  intellectual property ownership,
  confidentiality, and protection as detailed in
  previous novation agreement and mods.

JA1021-1022.  Mr. Tuttle explained that this proposed release of claims was

different from prior release of claim language (i.e., Modification 29):  "[I]t

didn't make any sense to continue the right to use because the contract

ended.  So the right to use ends.  And it didn't make sense to continue

escrow … but the duty of the Government to protect our intellectual

property shouldn't end."  JA475, line 25 through JA476, line 7.

### 4.    *AFNAFPO's Decision to Terminate the IBPS Contract*

On June 25, 2007, AFNAFPO told DSI that it was terminating the

IBPS Contract effective September 30, 2007.  JA1018.  When that decision

was shared with DSI, Mr. Carr wrote William Foran, AFNAFPO's Director,

reminding "AFNAFPO of [its] responsibilities in regards to DSI's

intellectual property and ownership rights of the software per the contract

and the software escrow agreement. " *Id.*

DSI hoped that AFNAFPO would recognize that its decision to move

to another contractor for a pure maintenance model of a one-off product was

unsustainable.[25]  JA416, line 15 through JA417, line 23.  Therefore, DSI

cooperated with AFNAFPO's efforts to move maintenance of the IBPS

source code to another contractor, while AFNAFPO was still under contract

with DSI.  JA418, line 9 through JA420, line 1.  On September 30, 2007, the

IBPS Contract expired; however, DSI continued providing maintenance

services under a delivery order issued by AFNAFPO.  *See* JA17, ¶ 34, JA18,

¶ 35; JA135, ¶ 18.

### 5.    *Delivery Order*

After AFNAFPO decided to terminate the IBPS Contract, it

determined that it needed DSI to continue performing certain work for a

period of roughly 8 months.  *See* JA17, ¶ 34, JA18, ¶ 35.  AFNAFPO's plan

was "to award an entirely new contract."  JA1023-1024.  On September 21,

2007, Marc Hyman, a new DSI contracts administrator, forwarded to Mr.

Browning the Air Force NAF Purchasing Office (AFNAFPO) Maintenance

Agreement, dated September 20, 2007.  *See* JA17-18, ¶ 34; JA1026-1031.

This original proposal purported to extend the IBPS Contract for 8 months.

*Id.* (Page 5).  In response to Mr. Hyman's e-mail, Mr. Browning wrote:

"This will not be an extension.  We will issue a delivery order against your

---

[25] A pure maintenance model for a one-off product is contrasted with a
COTS model, where costs are shared between a number of customers.
JA406, line 3 through JA107, line 14.

gsa [sic] schedule." JA1025. Accordingly, on September 26, 2007, in response to Mr. Browning's e-mail and a subsequent teleconference between Mr. Browning and Mr. Tuttle, DSI submitted the Air Force NAF Purchasing Office Maintenance Proposal (Revised) dated September 26, 2007 (the "Revised Proposal"). JA1032-1045; *see* JA18, ¶ 36.

Per AFNAFPO's request, the Revised Proposal was made in connection with an entirely new delivery order. Any rights, obligations, and/or duties that existed under the IBPS Contract were not carried forward into this new delivery order unless they were expressly provided for in the Revised Proposal. JA477, line 20 through JA478, line 7. With respect to intellectual property rights and the escrow process, the Revised Proposal provided the following in relevant part:

### 8  Intellectual Property Rights & Escrow Process

DSI proposes the following language be added to the resultant order:

DSI Rights:

DSI is the sole and exclusive owner of IBPS and all customizations, modifications and updates thereto, including without limitation, the project components, all software object and source codes, developer tools, and user manuals (collectively the "IBPS Intellectual Property"). DSI, as sole owner of the IBPS Intellectual Property, retains the exclusive right to re-use, modify, update or

otherwise change, modify, customize and update the IBPS Intellectual Property.  DSI retains all rights in the IBPS Intellectual Property including but not limited to the right to utilize, resell, license and distribute the IBPS Intellectual Property, its processes and technology for purposes and projects unrelated to AFNAFPO.

***AFNAFPO Rights*:**

***During the term of this Agreement*** AFNAFPO shall have the ***nonexclusive right to use IBPS Intellectual Property*** in the operation of its electronic eProcurement System.  AFNAFPO shall not sell, transfer or assign of [sic] IBPS Intellectual Property to a third party, nor will it allow any third party to use IBPS Intellectual Property in whole or in part other than to provide support for the AFNAFPO eProcurement System.  AFNAFPO shall have the right to allow other DoD NAF entities to become users of its eProcurement System subject to the terms of this agreement including any additional compensation due to or to become due to DSI..[sic] All rights not hereby specifically granted to AFNAFPO shall remain the sole property of DSI.

….

JA19, ¶ 36; JA1039 (emphasis added).  The Revised Proposal also provided that the "product and services provide[d] by DSI under Contract F41999-99-C-0027 have been accepted by AFNAFPO and DSI is released from all obligations of that contract."  JA1041.

On September 27, 2007, AFNAFPO faxed the Delivery Order to DSI, but inadvertently failed to reference or incorporate the Revised Proposal.

*See* JA18, ¶ 35, JA20, ¶ 37; JA1046-1047.  On September 28, 2007, Mr.

Tuttle wrote Mr. Browning and explained that DSI was "in receipt of [the

Delivery Order], however, it did not reference any of the proposed language

regarding IP ownership and the escrow process that we discussed or that was

included in our proposal (also attached)."  JA20, ¶ 37; JA41048-1073.  Mr.

Tuttle also continued:

> The fax we received did not contain the SOW
> referenced in the order so *we were unable to verify*
> *whether or not AFNAFPO accepted our proposal*
> *and/or included the language required by DSI as*
> *part of the follow-on contract/order to transition*
> *the IP protections, etc. from the previous contract*
> *per our discussion*.
>
> ….
>
> *The order transmitted via fax to DSI yesterday*
> *does not appear to reflect the discussion points or*
> *the intent of the parties*.
>
> Hopefully, this was simply an administrative
> oversight on the part of AFNAFPO while cutting
> the order.

*Id.* (emphasis added).

On September 28, 2007, in response to Mr. Tuttle's e-mail, Mr.

Browning wrote Mr. Tuttle, stating "[AFNAFPO is] in agreement with your

proposal and will be sending an admin mod it [sic] incorporate."   JA20,

¶ 37; JA1074. That same day, Mr. Tuttle confirmed Mr. Browning's e-mail, writing:

> Max: Got it. We look forward to receiving AFNAFPO's admin mod incorporating DSI's proposal ("Air Force NAF Purchasing Office Maintenance Proposal (Revised) dated September 26, 2007, in the near future.

JA1075-1076. On October 1, 2007, Mr. Browning forwarded Mod 0001 to Mr. Tuttle "incorporating DSI's proposal." *See* JA21, ¶ 38; JA1077-1085. Mr. Browning's e-mail attached both Modification 0001 and DSI's September 26, 2007 Revised Proposal specifically referenced therein. *Id.*

### G.    **AFNAFPO's Continued, Unauthorized Use of IBPS**

On May 31, 2008, the Delivery Order expired, along with AFNAFPO's right-to-use the IBPS. JA1039. Thereafter, the parties turned their attention to closing out the Delivery Order. On July 7, 2008, Mr. Hyman inquired of Mr. Browning as to how AFNAFPO wanted to proceed with close-out documentation. JA1090. In response, Mr. Browning e-mailed release of claim language, seeking to have DSI release any and all claims it may have under the IBPS Contract and the Delivery Order. *Id.* JA1089. DSI refused to execute the release of claims. In October 2008, Mike Singer, DSI's President at the time, wrote Mr. Browning and advised him that before DSI could provide AFNAFPO with a release of claims, the

parties needed to determine what compensation was due to DSI if

AFNAFPO was going to continue using IBPS, now that the IBPS Contract

and Delivery Order had both ended.  JA1093-1099.  Mr. Singer explained

that a telephone call would be the best way to discuss the issue because there

"is a great deal of detail involved in a discussion concerning the RTU (Right

To Use) the intellectual property (IP) that is still owned by DSI and resides

in the IBPS system (or any modified version)."  *Id.* JA1097.

When Mr. Browning received Mr. Singer's e-mail, he reached out to

other members of AFNAFPO,[26] stating:

> You will need to give me some history on this one
> … it is new to me.  Is this something that is in the
> novation agreement?

*Id.*; *see also,*  JA572, lines 8-21.  In response to Mr. Browning, Ms. Runkle

recommended that AFNAFPO consult with legal counsel to determine

AFNAFPO's rights.  *Id.*

Shortly after Mr. Singer's e-mail, on November 5, 2008, the parties

had a telephone conference wherein DSI advised AFNAFPO that its right-

to-use the IBPS had ended and that DSI was entitled to compensation for

AFNAFPO's unauthorized and continued use.  JA1103; JA570, lines 7-20.

No resolution was reached at this conference call, and on April 28, 2009,

---

[26] Specifically, Mr. Browning reached out to Jimmy Sawyer, Diana Runkle,
Janice Jones, and William Foran.  JA1097.

DSI forwarded an invoice to AFNAFPO that set a fair price for AFNAFPO's continuing right-to-use IBPS.  *See* JA22, ¶ 41; JA1100-1108; JA423-A, line 25 through JA423-B, line 7.  On June 10, 2009, Mr. Browning wrote Mr. Hyman, returning DSI's invoice "without action."  JA22, ¶ 42; JA1109.  Mr. Hyman, on behalf of DSI, responded to Mr. Browning's letter and set forth in detail DSI's position concerning the expiration of AFNAFPO's right-to-use IBPS.  *See* JA22, ¶ 43; JA1110-1126.

On January 26, 2010, DSI filed its claim with AFNAFPO, which was denied by Mr. Browning, the Contracting Officer, on March 18, 2010. JA22-23, ¶¶ 44-45; JA1127-1135.  On March 27, 2010, DSI forwarded a revised invoice, accounting for the additional year of unauthorized use by AFNAFPO.  JA1136.  On June 16, 2010, DSI filed its appeal with the Board, No. 57266.  JA23, ¶ 46.  After vacating its earlier ruling on motions for summary judgment, the Board conducted a hearing on June 4-7, 2013. JA23, ¶ 47.  After the Board issued its decision this appeal followed.

## SUMMARY OF THE ARGUMENT

In 2005, DSI and AFNAFPO negotiated and ultimately agreed on the terms under which DSI would complete, further enhance, and maintain a new, major version of the IBPS.  The plain language of the novation agreement and the contemporaneously executed Modification 22, as

37

confirmed by the surrounding circumstances and the parties' course of conduct, limited AFNAFPO's right-to-use the IBPS software to the term of the IBPS Contract, and later to the term of the Delivery Order. The Board erred by failing to construe Modification 22's clear, unambiguous language, which language limited AFNAFPO's right to use the IBPS software to the term of the IBPS Contract. The Board also erred in holding that DSI was required to advise AFNAFPO of DSI's interpretation of the language in paragraph 4 of Modification 22, which had been proposed by AFNAFPO. The Board improperly re-wrote the parties' contract, relying on AFNAFPO's undisclosed subjective intention that its proposed language be narrower than that which the words provided. The IBPS Contract, and the evidence of the surrounding circumstances at contract formation, demonstrated, at most, a unilateral mistake by AFNAFPO, from which it was not entitled to relief.

Independent of its errors regarding the language in Modification 22, the Board also erred by misconstruing the plain language of the Delivery Order, which clearly limits AFNAFPO's right to use the IBPS software to the term of the Delivery Order.

Accordingly, the IBPS Contract and the Delivery Order must be enforced according to their plain language, ending AFNAFPO's right-to-use

DSI's IBPS Software.  As a result, DSI has established that AFNAFPO's continuing, unauthorized use is a breach of the IBPS Contract and the Delivery Order, and this Court must reverse the decision of the Board and enter final judgment for DSI on liability.

## STANDARD OF REVIEW

This Court's review of a decision of the Armed Services Board of Contract Appeals is governed by the Contract Disputes Act of 1978, 41 U.S.C. § 7107 (2011).  This Court reviews the Board's conclusions of law *de novo.  Signal Contracting, Inc. v. Aspin*, 17 F.3d 1442 (Fed. Cir. 1994).  Any factual findings of the Board will not be disturbed if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

## ARGUMENT

The gravamen of this dispute is whether the IBPS Contract, after the execution of Modification 22, and subsequently the Delivery Order, allowed AFNAFPO the right to continue using DSI's software embedded as a part of the IBPS after expiration of the IBPS Contract, and later the Delivery Order. Both the plain language of the IBPS Contract and the Delivery Order, and the evidence regarding the parties' negotiations, make clear that the answer to that question is no.

39

The Board erroneously ruled that Modification 22 did not modify AFNAFPO's right-to-use the IBPS Software because: (1) AFNAFPO did not intend to limit its right-to-use the IBPS when it proposed the language in paragraph 4 of Modification 22; and (2) DSI did not disclose its interpretation as to the effect of AFNAFPO's proposed language. By relying on AFNAFPO's unexpressed intent, and by imposing a duty on DSI that does not exist at law, the Board gave AFNAFPO relief from its own unilateral mistake (i.e., offering broader language in paragraph 4 of Modification 22 than it intended). This was error, and the Board's decision must be reversed and final judgment must be entered in favor of DSI on liability. With regard to the Delivery Order, the Board somehow misconstrued indisputably plain language, and for that reason, provides an independent ground for reversal and judgment in favor of DSI.

### A.    General Contract Interpretation Principles

Familiar contract construction principles mandate that this Court give effect to the language freely negotiated by the parties. *Lockheed Martin IR Imaging Sys., Inc. v. W.*, 108 F.3d 319, 322 (Fed. Cir. 1997) ("General rules of contract interpretation apply to contracts to which the government is a party."). Where contract provisions are clear and unambiguous, they must be given their plain and ordinary meaning. *See Alaska Lumber & Pulp Co.,*

*Inc. v. Madigan*, 2 F.3d 389, 392 (Fed.Cir.1993). A contract must be interpreted "as a whole, and 'in a manner which gives reasonable meaning to all its parts and avoids conflict or surplusages of its provisions.'" *United Int'l Investigative Serv. v. U.S.*, 109 F.3d 734, 737 (Fed. Cir. 1997) (citing *Granite Constr. Co. v. U.S.*, 962 F.2d 998, 1003 (Fed. Cir. *1992))*. In addition, the terms of a contract must be given their "ordinary meaning appropriate to the subject matter, unless a special or unusual meaning of a particular term or usage was intended and was so understood by the parties." *Lockheed Martin IR Imaging Sys., Inc.*, 108 F.3d at 322 (citations omitted). "[A]n interpretation which gives a reasonable meaning to all parts of an instrument will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless or superfluous; nor should any provision be construed as being in conflict with another unless no other reasonable interpretation is possible." *HOL-GAR Mfg. Corp. v. U. S.*, 351 F.2d 972, 979 (Ct. Cl. 1965).

Under certain circumstances, extrinsic evidence may be used to illuminate the parties' intent, *though it may not be used to vary or modify the parties' express language. See Beta Systems, Inc. v. U.S.*, 838 F.2d 1179, 1183 (Fed. Cir. 1988) ("[E]xtrinsic evidence will not be received to change the terms of a contract that is clear on its face); *see also Mellon Bank, N.A.*

*v. Aetna Bus. Credit, Inc.*, 619 F.2d 1001, 1013 (3d Cir. 1980) ("Although extrinsic evidence may be considered under proper circumstances, the parties remain bound by the appropriate objective definition of the words they use to express their intent …. For example, extrinsic evidence may be used to show that 'Ten Dollars paid on January 5, 1980,' meant ten Canadian dollars, but it would not be allowed to show the parties meant twenty dollars.").  The Court may not re-write the IBPS Contract to make it more reasonable for one of the parties – as the Board did – or  to relieve a party from what turns out to be a "bad bargain."[27]  *George Hyman Constr. Co. v. U.S.*, 832 F.2d 574, 581 (Fed. Cir. 1987) ("If we accepted this argument, we would have to rewrite the contract and insert words the parties never agreed to, which we do not have the authority to do."); *see also Appeal of Anderon-Nichols & Co.*, ASBCA No. 6269, 1962 BCA ¶ 3398 (May 23, 1962) ("This Board is without authority to rewrite a contract or to relieve either party from the burden of an unwise bargain.").

---

[27] This contract construction principle is well-settled:  "As a general principle … the question whether a bargain is smart or foolish, or economically efficient or disastrous, is not ordinarily a legitimate subject of judicial inquiry.  If freedom of contract means anything, it means that parties may make even foolish bargains and should be held to the terms of their agreements."  11 Williston on Contracts § 31:5 (4th ed.).

**B.    The Board Erred by Failing to Construe Modification 22's Clear, Unambiguous Language Limiting AFNAFPO's Right-To-Use The IBPS Software, Relying Instead on AFNAFPO's Undisclosed Subjective Intent.**

Modification 22 and the contemporaneous novation agreement were the vehicles by which DSI entered the IBPS contract. Modification 22, negotiated between DSI and AFNAFPO, outlined the parties' expectations and defined, among other things, the duration of AFNAFPO's right-to-use the IBPS. *See* JA13-14, ¶¶ 27-28 ("Modification 22 … address[ed] any issues or deviation from or conditions that [the parties] want[ed] to discuss as a part of the contract."). Modification 22 states, in relevant part:

> Modification M0015 shall remain in effect but will be changed to reflect DSI in lieu of "Susquehanna Technologies." *This modification is valid for the entire life of the contract and will not be considered complete until the contract is closed.*

JA13-14, ¶ 27; JA879 (emphasis added).

In Modification 15, AFNAFPO and DSI's predecessor had set forth their respective intellectual property rights in three paragraphs. The first paragraph listed the duration (i.e., "continuous") and type (i.e., "non-exclusive") of AFNAFPO's right-to-use the IBPS software in the operation of AFNAFPO's eProcurement system. The second paragraph addressed the contractor's obligation to escrow software source code and the specific instances when AFNAFPO would be authorized to withdraw source code

43

from escrow (i.e., the "right-to-access" source code).[28]  The third paragraph confirmed the contractor's ownership of the IBPS and further circumscribed AFNAFPO's right-to-use the software and imposed on AFNAFPO certain duties to protect the contractor's intellectual property.  *See* JA6-7, ¶ 12.

The plain meaning of Modification 22 is that AFNAFPO's right-to-use the IBPS, which was originally stated in Modification 15, lasts only until the end of the IBPS Contract.  Modification 22's pronouncement that Modification 15 is "valid for the entire life of the contract" is susceptible to only one reasonable interpretation:  That AFNAFPO's right-to-use ends with the expiration of the IBPS Contact.[29]  The Board did not find any other reasonable interpretation of Modification 22's language.  Even if the Board

---

[28] While the second paragraph of Modification 15 identifies the specific instances under which AFNAFPO is permitted to withdraw source code from escrow, one must refer back to the right to use in the first paragraph of Modification 15 (and later Modification 22 and Rider C, Amendment 1) to determine AFNAFPO's right-to-use any source code retrieved from escrow. JA520, line 25 through JA521, line 10.

[29] Given that there is only one reasonable interpretation of paragraph 4 of Modification 22, this language is not ambiguous.  A contract is ambiguous only "[i]f the contract is susceptible to more than one reasonable interpretation."  *Appeal of Trace Sys., Inc.*, ASBCA No. 57574, 11-2 BCA ¶ 34861 (Oct. 20, 2011) (citing *Metric Constructors, Inc. v. NASA*, 169 F.3d 747, 751 (Fed. Cir. 1999)).

had determined that an ambiguity existed in paragraph 4's language, it

would have been required to apply the doctrine of *contra proferentem* to

DSI's reasonable interpretation of the language in paragraph 4 of

Modification 22, which was drafted by AFNAFPO:

> [I]f some substantive provision of a government-
> drawn agreement is fairly susceptible of a certain
> construction and the contractor actually and
> reasonably so construes it, in the course of bidding
> or performance, that is the interpretation which
> will be adopted.... If the [government] chafes
> under the continued application of this check, it
> can obtain a looser rein by a more meticulous
> writing of its contracts....

*Lockheed Martin IR Imaging Sys., Inc. v. W.*, 108 F.3d 319, 322-23 (Fed.

Cir. 1997) (quoting *WPC Enterprises, Inc. v. United States,* 163 Ct.Cl. 1,

323 F.2d 874, 877–78 (1963)); *see also HPI/GSA 3C, LLC v. Perry*, 364

F.3d 1327, 1334 (Fed. Cir. 2004) ("The general rule is contra proferentem,

which requires ambiguities in a document to be resolved against the

drafter."); *Jones Construction Company*, VABCA No. 929, 70-1 BCA ¶ 8,

267 (Holding that "[i]f the words and figures used to express the contract

requirements [, which were drafted by the government,] are susceptible to

two meanings, either of which would be reasonable, the ambiguity is to be

resolved in favor of the interpretation adopted and relied upon by the

contractor.").

In this case, the Board utterly failed to construe paragraph 4 of
Modification 22 – the key contract language in dispute – as required by
settled contract interpretation principles.  The Board merely expressed that it
was "dubious" that paragraph 4's language was intended to limit the
duration of AFNAFPO's right to use.  JA27 ("We are dubious that the
phrase '[t]his modification is valid for the entire life of the contract and will
not be considered complete until the contract is closed' can reasonably be
interpreted on its face to divest AFNAFPO of its perpetual right to use IBPS,
a right, according to DSI's claim, worth tens of millions of dollars over
time.").  Rather than focus on the plain language in paragraph 4, which is
clear and unambiguous, the Board relied on AFNAFPO's unexpressed intent
to allow it a perpetual right-to-use.[30]  By holding that AFNAFPO's right-to-
use the IBPS somehow extended beyond the IBPS Contract term, the Board
rendered the language of the second sentence of Modification 22 (i.e., "This
modification is valid for the entire life of the contract and will not be
considered complete until the contract is closed") superfluous, in violation of
clear contract interpretation principles.  *United Intern.*, 109 F.3d at 737; *see*

---

[30] Given its reference to the value of DSI's claim, the Board clearly appears
to have been troubled by what it perceived as a "bad bargain" for
AFNAFPO.  However, the amount of potential government liability has no
proper role in the interpretation of contract language.  *See* 11 Williston on
Contracts § 31:5 (4th ed.)

*also Appeal of Hughes Moving & Storage, Inc.*, ASBCA No. 45346, 98-1

BCA ¶ 29693 (Mar. 31, 1998) (quoting *HOL-GAR Manufacturing Cop. v.*

*U.S.,* 351 F.2d 972, 979 (Ct. Cl. 1965)) (internal quotations omitted) ( "We

[the Board] must avoid a meaning which leaves a portion of it useless,

inexplicable, inoperative, void, insignificant, meaningless or superfluous

....").

Accordingly, based on the clear, unambiguous language of

Modification 22, AFNAFPO is in breach of the IBPS Contract for its

unauthorized continued use of the IBPS after the expiration of the IBPS

Contract.

> **1.**    ***The Circumstances Surrounding The Execution of the Novation Agreement and Modification 22 Confirm That AFNAFPO's Right-to-Use Was Intended To Be Limited To The Term Of The IBPS Contract***

"Before an interpreting court can conclusively declare a contract

ambiguous or unambiguous, it must consult the context in which the parties

exchanged promises." *Metric Constructors, Inc. v. Nat'l Aeronautics &*

*Space Admin.*, 169 F.3d 747, 752 (Fed. Cir. 1999).  Thus, in interpreting a

contract, the Court may look to the "the language employed, the subject-

matter, and the surrounding circumstances" so as not to be "shut out from

the same light which the parties enjoyed when the contract was executed…."

*W. States Constr. Co., Inc. v. United States*, 26 Cl. Ct. 818, 825 (1992)

(quoting *Nash v. Towne*, 72 U.S. 689, 698 (1866)); *see also Blinderman Constr. Co., Inc. v. U.S.*, 39 Fed. Cl. 529, 539 (1997) (noting that "under time–honored principles, [a Court] look[s] not only to the language employed by the contract, but also to the subject matter and the circumstances surrounding the contract's making.").  When the Court places itself in the same situation as the parties who made the contract, the meaning of paragraph 4 of Modification 22 (namely, "valid for the entire life of the contract") is clear and limits AFNAFPO's right-to-use the IBPS to the term of the IBPS Contract.

In June or July 2005, AFNAFPO was informed by SusQTech, its contractor at the time, that SusQtech was being divested by its parent company and would not continue as an operating entity.  JA496, line 1 through JA497, line 1.  To say this left AFNAFPO in a bind is putting it mildly.  SusQTech was already late in delivering Release 4 of IBPS, a critical major upgrade.  JA421, lines 22-25.  Release 4 was the key to the continuation of the IBPS Program.  JA509, lines 13-19.  Release 4 needed to be completed and deployed by November 2005 or the IBPS was going to be pulled from the Air Force internet and would be unavailable to all field users.  JA493, line 25 through JA494, line 21; JA495, lines 18-21; and JA497, line 2 through JA499, line 22.  Frankly, AFNAFPO was desperate.

JA497, line 2 through JA499, line 22 ("[W]e had a drop dead date that we had to get off that system and get out Release 4…so we [were] getting pretty desperate.").

Around the same time, DSI was finalizing its purchase of SusQTech's IBPS assets and exploring the possibility of novating into the IBPS Contract. Once DSI purchased the IBPS assets "free and clear of all liens, encumbrances and liabilities," DSI was very much in a "take it or leave it" position with respect to the IBPS Contract.  JA780.  While DSI was interested in the prospect of gaining a long term customer, it was not going to take on the IBPS Contract without mitigating unacceptable risks.  If a deal could not be struck, DSI could just walk away and incorporate portions of the IBPS assets into its COTS line of products.  JA404, lines 7-23.

DSI's due diligence quickly revealed that it could not simply step into SusQTech's shoes.  JA407, line 25 through JA409, line 25.  SusQTech had failed in many respects, and merely stepping into SusQTech's shoes could expose DSI to substantial liability.  JA410, line 5 through JA411, line 3. Also, the project would require a costly investment on DSI's part to get Release 4 of the IBPS functional in such a short period of time (i.e., 3 months).  The only way to insure that DSI would have an adequate return on its investment was to insure that AFNAFPO did not have rights that

extended beyond the term of the IBPS Contract.  JA412, line 17 through

JA414, line 11 and JA415-A, lines 4-22.

DSI's initial contract review revealed the absence of any language

suggesting that AFNAFPO had perpetual rights to use the IBPS.  However,

additional due diligence revealed that both AFNAFPO and SusQTech

seemed to believe that the language of Modification 15 granted a perpetual

right to use the current IBPS system.  JA438, lines 9-17.  *See* JA9, ¶ 19.  As

a result, DSI clearly and unequivocally proposed the end to all rights and

duties stated in Modification 15 by proposing that it be complete and

accepted by the government before DSI stepped into the IBPS Contract.  *See*

JA11, ¶ 21; JA442, lines 7-18.  Paragraph (a)(1) of DSI's proposed novation

agreement clearly stated those portions of the IBPS Contract that DSI was

willing to take over.  Modification 15 was not one of the modifications DSI

was willing to include in its new deal with AFNAFPO:



**Novation Agreement**

**SMC Interactive, Inc. TDBA Susquehanna Technologies (SMC)**, a corporation duly organized and existing under the laws of Delaware with its principal office in York, Pennsylvania; **Distributed Solutions, Inc. (DSI)**, a corporation duly organized and existing under the laws of Virginia with its principal office in Reston, Virginia; and the United States of America (Government) enter into this Agreement as of ~August 9, 2005~

Modifications M01 through M0007, M0009, M0010 (FY04 maintenance portion), M0011, M0015, M0019 and M0020 are complete and accepted by the Government.

including Modification M0021. The term "the Contract," the above Contract and modifications made between ... before the effective date of this Agreement, and include ... ugh M0021. Modifications M01 through M0007, M0009, M0010 ... nce portion), M0011, M0015, M0019 and M0020 are complete ... pted by the Government. Modifications M008, M0010 (Release 4 portio ... Mod 0012 and Mod 0013 shall be considered accepted and completed upon the acceptance of Release 4 (R4) by the Government. Modification 0014 shall be considered accepted and completed on 9/30/2005 (the end of FY2005). The Government has issued a Stop Work Order on Modifications M0016, M0017 and M0018. DSI is willing to perform Modifications M0016, M0017 and M0018 if the Stop Work Order is lifted subject to a supplemental agreement on the terms. Modification M0021 will be performed by DSI.

JA772-812; *see* JA444, line 11 through JA445, line 7; JA11, ¶ 22.

At least one member of the AFNAFPO team – Ms. Jones – recognized that DSI sought to eliminate both AFNAFPO's right-to-use the IBPS and the contractor's escrow obligations in Modification 15:

> We [AFNAFPO] were concerned that if they [DSI] said that [Modification 15] was closed that they would be taking away what we had just put into Mod 15, which gave us the right to use IBPS software.

*See* JA12, ¶ 23; JA502, lines 3-13; *see also* JA862-865. Others, like Mr. Henson, appeared more concerned about the impact of DSI's proposal on the contractor's obligation to escrow source code. *See* JA11, ¶ 22; JA534, lines 7-16.

After the senior AFNAFPO management team vetted all their respective concerns, completed due diligence reviews, and consulted with legal counsel, AFNAFPO drafted and sent to DSI a "counter proposal," with language providing that Modification 15 would be "valid for the entire life of the contract." JA879; *see* JA12, ¶ 24. There was nothing in AFNAFPO's language that suggested that the limitation applied only to DSI's escrow obligation rather than rights to use or access source code. JA545, lines 9-12. To the contrary, the plain language limited all of Modification 15 to the term of the IBPS Contract. Accordingly, based on the plain language, DSI found AFNAFPO's language to be an acceptable compromise and a new deal was struck.

While the language in paragraph 4 of Modification 22 is clear on its face, reference to the circumstances under which AFNAFPO proposed this compromise language compels the conclusion that AFNAFPO's right-to-use the IBPS expired along with the IBPS Contract. When the Court places itself in the position of the parties during the above-referenced negotiations, it must conclude that AFNAFPO's compromise language in paragraph 4 limited AFNAFPO's right-to-use to the term of the IBPS Contract.

To rule otherwise, is violative of a host of contract construction principles. If, as the Board found, AFNAFPO intended to retain a perpetual

right-to-use through its language in Paragraph 4 of Modification 22,

AFNAFPO failed to express that intention to DSI during negotiations.  An

unexpressed intention cannot be used to interpret language, even where there

is ambiguity.  Where the language is clear and unambiguous – such as in this

case – an unexpressed intention certainly cannot be used to write a new

contract between the parties – as the Board did.

Perhaps recognizing that these well-established contract interpretation

principles favored DSI's interpretation of paragraph 4, the Board improperly

imposed a duty on DSI to advise AFNAFPO of DSI's interpretation of

AFNAFPO's proposed language.  No authority exists for such a duty.

*Andersen Consulting v. U.S.*, 959 F.2d 929, 934 (Fed. Cir. 1992) (Noting

that contract proposals must be evaluated on the basis of what they contain,

not what their authors intended that they contain and holding that the

subjective, unexpressed intent of one of the parties to a contract is

irrelevant); *SUFI Network Serv., Inc*., ASBCA No. 55306, 09-1 BCA ¶

34018 (Nov. 21, 2008) (holding that AFNAFPO's unexpressed intention

could not be used to resolve ambiguity).

Instead, all this unexpressed intention shows, if anything, is a

unilateral mistake by AFNAFPO in drafting and offering language that was

broader than it hoped.  *See* JA534, lines 7-16.  ("We really didn't think at the

time … that it even addressed the rights of AFNAFPO.").  The Board should have recognized that any uncertainty about the meaning of paragraph 4 of Modification 22 is the result of AFNAFPO's unilateral mistake in offering broader language than it intended.  Unilateral mistakes generally do not provide a basis for relief, and the circumstances here do not provide a basis to re-write AFNAFPO's language and reform it to match AFNAFPO's unexpressed intention.  *Albano Cleaners, Inc.*, 455 F.2d at 560 ("A unilateral mistake … does not serve to relieve a party of his contractual obligations.")

Here, there is no evidence to suggest that Mr. Tuttle or anyone else at DSI had any knowledge of AFNAFPO's unexpressed intent.  JA540, line 13 through JA541, line 25.  To the contrary, the evidence is clear and uncontroverted that Mr. Tuttle read AFNAFPO's language to limit AFNAFPO's right-to-use the IBPS and right-to-access source code, as well as DSI's obligation to escrow source code, to the term of the IBPS Contract.[31]  JA451, lines 2-13.  Under the circumstances, it was an acceptable compromise.  The Court must give the words used in a contract their usual and ordinary meaning even if "the intention of one of the parties may have been different from that expressed in the contract."  *Appeal of*

---

[31] The evidence further shows that DSI acted consistently with this interpretation over the life of the IBPS Contract.  *See* Argument, section B.3, *infra*.

*Fairchild Indus., Inc.*, ASBCA No. 16413, 74-1 BCA ¶ 10567 (March 29, 1974) (quoting *Dana Corp. v. U.S.*, 200 Ct. Cl. 200, 217 (1972)).  When paragraph 4 stated that Modification 15 would only be "valid for the entire life of the contract," the usual and ordinary meaning to be derived from the plain language is that the entire Modification – and all rights granted and duties imposed thereby – ends at the expiration of the IBPS Contract.  If the language was intended to apply to a limited set of terms found in Modification 15 (and not all of the terms in Modification 15), it was incumbent on the drafter of that language (here, AFNAFPO) to express that intent in clear language that reflects this intention.  A failure to express one's intention in the language used provides no basis for relief. *Andersen Consulting,* 959 F.2d at 934; *see also Albano Cleaners*, 455 F.2d at 560; *Appeal of Fairchild Indus., Inc*., ASBCA No. 16413, 74-1 BCA ¶ 10567 (noting that the "undisclosed subjective intent of the drafter can play no part" in determining the intent of the parties manifested objectively in the terms of the contract.).

### 2. *The Board Improperly Re-wrote the IBPS Contract to Overcome AFNAFPO's Unilateral Mistake*

The Board erred in re-writing the IBPS Contract (specifically Modification 22) to overcome AFNAFPO's unilateral mistake and capture its unexpressed intention.  Specifically, the Board erroneously concluded

that "DSI, on notice that AFNAFPO had a perpetual right to use IBPS for free, endeavored to divest AFNAFPO of that right through the language of the novation and Mod. M0022 without disclosing its intention and interpretation to AFNAFPO."  JA27.

First, the Board's conclusion is contrary to its own findings.  DSI disclosed its intention through clear language in its initial novation proposal. The Board found that Ms. Jones, AFNAFPO's deputy director, understood DSI's initial proposal to be an attempt to divest AFNAFPO of any perpetual right-to-use.  JA12, ¶ 23 (Finding Ms. Jones "testified that the language in the draft novation that Mod. M0015 was 'complete and accepted by the Government' was 'one of our major concerns in there because we needed to make sure that we had the right to get the software if we ever needed the source code'" and that AFNAFPO was "concerned '[t]hat we would be able to continue to use IBPS'").

In addition, in the context of bilateral negotiations, the law does not impose a duty on the receiving party to advise the drafter of the receiving party's interpretation of the language proposed by the drafter.  Such a rule would create chaos.  Yet, that is the sole basis for the Board's decision in favor of AFNAFPO.  Accordingly, the Board's decision must be reversed.

### 3. *The Parties' Subsequent Conduct and Contract Language Confirmed the Limited Duration of AFNAFPO's Right-to-Use the IBPS Software.*

After the parties structured their new deal in Modification 22, DSI and AFNAFPO continued to reaffirm the limited scope and duration of AFNAFPO's right-to-use the IBPS in Modification 28, Modification 29, proposed Modification 32, and the Delivery Order. *See* JA654-659, 996-1011, 1016, 1021-1022, 1026-1031, 1046-1047, and 1077-1085.

Modification 28 incorporated Amendment 1 to Rider C into the IBPS Contract. While Modification 15 outlined the contractor's duty to escrow source code and the circumstances when AFNAFPO could retrieve escrowed source code, Modification 28 and Rider C explained precisely how the process would work and what use AFNAFPO could make of source code retrieved from escrow. JA926-928. In Rider C, AFNAFPO agreed to the following provision that explicitly reaffirmed AFNAFPO's limited right-to-use any IBPS source code retrieved from escrow:

> 2. [DSI's] sole ownership of IBPS and [AFNAFPO's] Right-to-Use are per AFNAFPO Contract F41999-99-C-0027, Modification M0015 ***as modified by*** Modification M0022.
>
> ****
>
> 6. Paragraph 8 "Release of Deposit Materials", subparagraph (e) "Restrictions on Use" subparagraph (iii) is revised to read: "(iii)

> [AFNAFPO] agrees to use the Deposit Materials under carefully controlled conditions in accordance with, and for the purposes of, this Agreement and solely in conjunction with the terms and conditions of AFNAFPO Contract F419999-99-C-0027, Modification M0015 ***as modified by*** Modification M0022.

See JA16, ¶ 33; JA659.  (emphasis added).

Through Modification 29, the parties agreed to extend the period of the IBPS Contract performance until September 30, 2007.  JA996-1011.  In that modification, the parties renewed their respective intellectual property rights for the extended period of performance:

> 9)  Intellectual Property Ownership, Right-to-Use and Escrow
>
> The rights and responsibilities of the Parties in regards to intellectual property ownership, right-to-use and escrow in Modifications M0015 and M0022 remain in full force.

JA997; JA15, ¶ 30.  This language leaves no doubt that AFNAFPO's right-to-use the IBPS Software ended at the end of the IBPS Contract.  Mr. Tuttle explained that paragraph 9 was necessary to carry forward AFNAFPO's right-to-use and DSI's obligation to escrow source code in light of the release of liabilities, obligations, claims and demands in paragraph 10 of Modification 29.  JA468, line 22 through JA470, line 6; *see also* JA997.  If

AFNAFPO had a perpetual right-to-use, there would be no need to carry forward the right-to-use into the extended period of performance.

When the parties negotiated Modification 32 (which was never executed), DSI again reminded AFNAFPO its right-to-use the IBPS Software ended at the end of the IBPS Contract.  Indeed, when it was clear that Modification 32 was intended to be a close-out modification, DSI only proposed that AFNAFPO's duties in regard to DSI's intellectual property continue beyond the expiry of the IBPS Contract, not its right-to-use the IBPS Software.  JA1019-1020, 1021-1022.  This proposal was entirely consistent with each and every contract document from Modification 22 forward that addressed AFNAFPO's right-to-use, leaving no doubt that AFNAFPO's right-to-use the IBPS Software ended at the end of the IBPS Contract.

AFNAFPO never objected to the parties negotiated language in Modifications 22, 28, 29 or proposed Modification 32 as stating more limited rights to use than that provided by the IBPS Contract.  Only when faced with the choice of no longer using the IBPS or compensating DSI for the use of its intellectual property did AFNAFPO contend that its right-to-use extended beyond the term of the IBPS Contract.

**C.    The Board Erred by Misconstruing The Delivery
Order's Clear Language, Which Provides an
Independent Limitation on AFNAFPO's
Right-to-Use the IBPS and Limits AFNAFPO's
<u>Rights to the Duration of the Delivery Order.</u>**

Prior to the expiration of the IBPS Contract, AFNAFPO elected to
extend DSI's work through a separate IBPS Delivery Order, dated
September 26, 2007.  JA17, ¶ 34; JA1046-1047, 1077-1085.  In M001 to the
Delivery Order, the parties agreed to incorporate "Air Force NAF
Purchasing Office Maintenance Proposal (Revised)," dated September 26,
2007, into the Delivery Order.  *See* JA20, ¶ 37, JA21, ¶ 38; JA41048-1085.
The incorporated proposal clearly states the parties' respective intellectual
property rights in the IBPS in terms that mirror those in Modification 15 as
modified by Modification 22, and, just as in the IBPS Contract, the right-to-
use in the Delivery Order is limited to the term of the Delivery Order.
Specifically, the Delivery Order states:

> ***During the term of this Agreement***, AFNAFPO
> shall have the nonexclusive right to use IBPS
> Intellectual Property in the operation of its
> electronic eProcurement system.

JA19, ¶ 36; JA1084; *see* JA21, ¶ 38.  (emphasis added).

In its Answer, AFNAFPO admitted that the "substantive aspects of
[the] intellectual property provisions [in the Delivery Order] would have
prohibited AFNAFPO from using the IBPS software beyond the expiration

60

of the 1375 delivery order on May 31, 2008." JA131, ¶ 3. That is precisely DSI's interpretation! Thus, AFNAFPO's admission alone should end any debate as to the meaning of the plain language of the Delivery Order.

Initially, AFNAFPO's only defense to the Delivery Order language was to assert that "neither the basic award document nor the sole modification [M0001] to this delivery order recited any of the proposed intellectual property provisions." *Id.* However, the plain language of the Delivery Order and Modification M0001,[32] and the evidence surrounding its incorporation into the Delivery Order, as determined by the Board, belie AFNAFPO's assertion. JA18-19, ¶ 36; JA20, ¶ 37; JA21, ¶ 38.

The Board erred by misconstruing the plain language "[d]uring the term of the [*sic*] Agreement." In its Opinion, the Board held "That AFNAFPO's rights were to be maintained 'during the term of the agreement,' says nothing about the status of those rights thereafter." JA29. The phrase "[d]uring the term of the Agreement" is susceptible to only one reasonable interpretation. It is a temporal limitation on AFNAFPO's rights stated in the Delivery Order, including the right-to-use the IBPS software.

The Board's interpretation not only ignores the language's plain and ordinary meaning, it also ignores the circumstances surrounding the

---

[32] Specifically, the face of the Delivery Order states, in part: "See Attached Statement of Work." JA1047.

Delivery Order's execution.  When DSI received the Delivery Order by fax, it was missing DSI's September 26, 2007 Proposal.  *See* JA18, ¶ 35; JA20, ¶ 37; JA1048-1073.  Mr. Tuttle wrote Mr. Browning and noted that the Delivery Order received did not "reference any of the proposed language regarding IP ownership and the escrow process that we discussed or that was included in our proposal (also attached)."  JA20, ¶ 37; JA1048-1073.  Mr. Tuttle continued, "The fax we received did not contain the SOW referenced in the order so we were unable to verify ***whether or not AFNAFPO accepted our proposal and/or included the language <u>required</u> by DSI as part of the follow-on contract/order*** to transition the IP protections, etc. from the previous contract per our discussion."  *Id.* (emphasis added).  In response to this September 28, 2007 e-mail, Mr. Browning unequivocally stated, "***We are in agreement with your proposal*** and will be sending an admin mod it [sic] incorporate."  JA20, ¶ 37; JA1074.  AFNAFPO then forwarded Modification M0001 incorporating the Revised Proposal stating the parties' respective intellectual property rights, including a statement specifically limiting AFNAFPO's right-to-use the IBPS to the term of the Delivery Order.  *Id.; see* JA21, ¶ 38; *see also* JA559, lines 4-9.

In the face of the overwhelming evidence that the Revised Proposal was incorporated into the Delivery Order by an administrative modification,

AFNAFPO argued that it had no reason to know that the language in the Revised Proposal limited the duration and scope of AFNAFPO's right-to-use to the term of the Delivery Order – that is, other than the language itself.[33]  *See* JA21-22, ¶ 39; JA560.   The evidence reveals that if AFNAFPO did not understand the language in the Revised Proposal, it is solely because Mr. Browning – a senior, warranted contracting officer – did not bother to read the Revised Proposal before incorporating it into the Delivery Order. Indeed, Mr. Browning testified that when he received the Revised Proposal, he did not "dissect it down to the word," he gave the language concerning the parties' respective intellectual property rights "no weight," and he did not have the Revised Proposal reviewed by AFNAFPO's legal counsel. JA560, line 1 through JA569, line 9.  In other words, Mr. Browning had the opportunity to read the Revised Proposal and have it reviewed by Air Force counsel, but he did not bother to do so.  *Turner Const. Co., Inc. v. United States,* 367 F.3d 1319, 1321 (Fed.Cir.2004) (citation omitted) ("[t]he parties [in a government contract action] are charged with knowledge of law and fact appropriate to the subject matter, and reasonable professional competence in reading and writing contracts is presumed").  "[I]if a party to

---

[33] In reality, the inclusion of language clearly limiting AFNAFPO's right-to-use the IBPS to the term of the Delivery Order was unremarkable because it merely continued AFNAFPO's limited right-to-use for the new period of performance under the Delivery Order.

a contract is able to but does not read it, then he is negligent and cannot plead this negligence in his defense." *Hyde Park Clothes v. U. S.*, 84 F. Supp. 589, 592 (Ct. Cl. 1949); *see also Appeal of Ssangyong Trading Co., Ltd.*, ASBCA No. 21614, 79-1 BCA ¶ 13810 (Apr. 13, 1979) ("In legal contemplation, when a party to a contract puts his signature on it he is, in essence, certifying certain things among which are his understanding of and ability to comply with the terms of the contract.")

Accordingly, separate and apart from its ruling on the IBPS Contract, the Board erred by failing to rule that AFNAFPO is bound by the clear, unambiguous language in the Delivery Order and that AFNAFPO's right-to-use the IBPS expired at the end of the Delivery Order term.

## CONCLUSION

For the reasons stated, DSI respectfully requests that this Court:

1.    Reverse the Board's decision and render judgment in DSI's favor on liability, finding that, as a result of the Court's ruling, AFNAFPO breached the IBPS Contract and the Delivery Order by its continued, unauthorized use of the IBPS Software owned by DSI; or

2.    Reverse the Board's decision and render judgment in DSI's favor on liability.

3.    In the alternative, reverse the Board's decision and remand this matter to the Board for further proceedings.

4.    Award all other relief to which DSI is justly entitled.

In addition, DSI respectfully requests the right to oral argument in this matter.

Respectfully submitted,

DISTRIBUTED SOLUTIONS, INC.

By: _____s/Thomas A. Coulter_____
                        Counsel

Dated: _____January 22, 2015_____

Thomas A. Coulter          (Virginia State Bar No. 46532)
                          (D.C. Bar No. 436423)
LeCLAIRRYAN, A Professional Corporation
951 East Byrd Street
Richmond, Virginia 23219
Mail:  P.O. Box 2499
Richmond, Virginia  23218
Telephone:  (804) 783-2003
Facsimile:   (804) 783-2294
Email:   thomas.coulter@leclairryan.com

# **<u>ADDENDUM</u>**

# ADDENDUM

Opinion by Administrative Judge Clarke
     Dated August 4, 2014 ........................................................... JA1-29-A

ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeal of -- | ) | |
| | ) | |
| Distributed Solutions, Inc. | ) | ASBCA No. 57266 |
| | ) | |
| Under Contract No. F41999-99-C-0027 | ) | |

APPEARANCES FOR THE APPELLANT:    Stephen M. Faraci, Sr., Esq.
Thomas A. Coulter, Esq.
LeClairRyan
Richmond, VA

APPEARANCES FOR THE GOVERNMENT:    Col Robert J. Preston II, USAF
Acting Air Force Chief Trial Attorney
Christine C. Piper, Esq.
Skye Mathieson, Esq.
Trial Attorneys

OPINION BY ADMINISTRATIVE JUDGE CLARKE

Distributed Solutions, Inc., (DSI) claims that the Air Force Non-Appropriated
Fund Purchasing Office (AFNAFPO) must pay it a license fee for using the Internet-
Based Purchasing System (IBPS) software that it owns. The AFNAFPO agrees that DSI
owns the software, but contends that it has the right to use its version of the IBPS at
no cost.

FINDINGS OF FACT

Order No. F41999-97-F-6019

1. Order No. F41999-97-F-6019 (6019) under Contract No. 263-97-D0334 was
awarded by AFNAFPO, San Antonio, Texas, to GCG Computers (GCG) on 8 October
1997 to develop an IBPS (R4, tabs 54, 73). The $392,385 contract listed three contract
line item numbers (CLINs):

> 0001    Software Development, CLIN 6175, convert the
> Electronic Commerce Purchasing System (ECPS) from
> a DOS based program to an internet/intranet program
> in accordance with the attached statement of work,
> requirements incorporated by the question answer

JA1

session of the pre-proposal conference, and the
proposal submitted by GCG.  ($376,000.00)

0002   Training, CLIN 9002, training of 50 Agency personnel
either at 9504 IH 35 N or Airport Center Building in
San Antonio TX.  ($12,500.00)

0003   NIH administrative fee, CLIN 9999, 1 % of total.
($3,885.00)

(*Id.*)  Delivery was specified as 30 September 1998 (*id.*).

2.  The "Statement of Work Development of Internet-based Purchasing System"
(SOW) had the stated objective:  "To obtain customized software or existing
commercial-off-the-shelf (COTS) software that will be modified to meet 100 percent of
the specifications in this statement of work" (R4, tab 55 at 190, tab 73 at 292).  The SOW
set forth the organizational structure that must be supported, a description of the current
Electronic Commerce Purchasing System (ECPS) and the "System Requirements" for the
IBPS (R4, tab 55 at 189-95, tab 73 at 291-97).

3.  Judd's, Inc., the major subcontractor working with GCG, submitted the
technical proposal that was physically included in the contract at award (R4, tabs 57,
73 at 272-90).  Part II of Judd's, Inc.'s proposal, "Proposed Solutions and Associated
Costs" discussed Architecture, Project Development Process, Project Development
Milestones, Delivery Time, and Technical Support (R4, tab 57 at 217, tab 73 at 284).
The Architecture section lists a variety of primarily Microsoft® commercial COTS
products that would be employed to provide the required customized solution (R4, tab 57
at 217-20, tab 73 at 284-87).  The Source Code Management paragraph provided that "***all***
source code developed specifically for the project will be delivered with the project as
part of the baseline fixed cost" (R4, tab 57 at 219, tab 73 at 286).  The Project
Development Milestones included two prototypes, a system pilot and system
implementation.  After system implementation, a 90-day warranty period went into effect
followed by help desk support.  (R4, tab 57 at 221-22, tab 73 at 288-89)

4.  The two copies of the 6019 Order in the record do not have a list of clauses
incorporated by reference or any provisions addressing intellectual property (R4,
tabs 54-57, 73)[1].  The copy of the 6019 Order in DSI's supplement to the Rule 4
included, "Answers to Questions Posed Regarding the Internet-based Purchasing System"
that included the following:

---

[1] The record does not contain the terms and conditions of Contract No. 263-97-D0334.

**Q26. What rights does AFNAFPO expect to retain with respect to the internet purchasing system?**

A26. We expect to be able to provide the full range of purchasing functionality offered by the internet purchasing system to all government NAF entities. We need to remove the DoD stipulation from the arrangement as made with Loren Data, as Coast Guard installations (DoT) use NAF funds, as well as a small handful of other government offices, i.e. the CIA dining room in the Pentagon.

(R4, tab 73 at 309, 314) The IBPS was not completed under the 6019 Order.

Contract No. F41999-99-C-0027

5. On 19 August 1999, Contract No. F41999-99-C-0027 (0027) in the total amount of $276,700 was awarded by AFNAFPO to Judd's Online, Inc. ("Judd's") for completion of the IBPS (R4, tab 1). The contract included seven CLINs:

0001 – Completion of software development for Internet Based Purchasing System (IBPS). System shall be an internet/intranet program in accordance with the attached statement of work (SOW). A core system (including User's Guide) will be completed and tested no later than 30 November 1999. System will be upgraded to SQL 7. $199,700

0002 – Installation of existing system. Installation shall be completed no later than 31 August 1999....$7500

0003 – Maintenance program for the IBPS -- This is an annual maintenance program with an option to extend annually up to 5 years from original start date....$50,000 annually

0004 – Help Desk – This is an annual help desk program with an option to extend up to 5 years from original start date.... $15,000 annually

0005 – 100% system installation....$7500

0006 – Training–Training includes no more that 50 personnel
per session, situated at the Headquarters Services Agency or
the AFNAFPO....$12,000 annually

0007 – Enhancements:  Scope, price, and performance period
of program enhancements shall be negotiated between the
parties.

(*Id.* at 2)  The period of performance was "5 years from the signature date of the
contracting officer with an option to extend an additional 5 years" (*id.*).  Attachments
1 and 2 to the 0027 contract identified and prioritized the development tasks remaining to
be accomplished to complete the IBPS (R4, tab 1 at 20, tabs 2, 3).

6.  The IBPS was to replace a DOS-based ECPS still being used by AFNAFPO at
the time of contract award (R4, tab 1 at 5).  The "Objective" in the Statement of Work was
"[t]o obtain customized software or existing commercial-off-the-shelf (COTS) software that
will be modified to meet 100 percent of the specifications in this statement of work" (*id.* at
3).  The contract at award did not include an intellectual property rights provision.  There
was no provision requiring AFNAFPO to pay royalties to use the IBPS.

7.  On 18 October 2000, Judd's (Transferor), SMC Interactive, Inc., (SMC)
(Transferee) and the AFNAFPO contracting officer signed a novation agreement
transferring contract 0027 from Judd's to SMC (R4, tab 7).  Paragraph A.4 of the
novation states:  "The Transferee has assumed all obligations and liabilities of the
Transferor under the contracts by virtue of the above transfer" (*id.* at 54).  The novation
agreement was incorporated into the 0027 contract by Modification No. 003 on
11 December 2000 (R4, tab 6).

8.  Through a series of name changes, SMC became SMC Interactive c/o BlazeNet
(BlazeNet), and eventually SMC Interactive, Inc., c/o Susquehanna Technologies, Inc.,
(SusQTech) (R4, tabs 8, 10; compl. ¶ 10).[2]

Modification No. M0015

9.  On 12 September 2003, Mr. Strimple, Partner SusQTech, emailed Ms. Jones,
Chief, Policies & Procedures Branch, AFNAFPO, (tr. 2/161) an escrow and intellectual
property document for her review that read in part:

AFNAFPO retains a perpetual non-exclusive license to utilize
the IBPS system for the purpose of operating an electronic

---

[2] From here on we use "SusQTech."

eProcurement system within the AFNAFPO organization.
This perpetual license may not be sold, transferred, assigned
or conveyed to any third party.

(Supp. R4, tab 100 at 10017-18) Ms. Jones forwarded this document to Mr. Sawyer,
Ms. Runkle and Mr. Woodard for review on 9 April 2004 (supp. R4, tab 100 at 10017).
Ms. Runkle, an AFNAFPO contract specialist (tr. 2/199), testified about this language,
"[i]t was what we wanted, continual never ending use of the source code" (tr. 2/219).

10.   On 30 December 2004, Mr. Sawyer, AFNAFPO, sent Ms. Runkle the "latest
wording from Doug [Stock, Director SusQTech] with the changes we asked for" (R4,
tab 59 at 229, 60 at 228).   The changed language read in part:

> ***AFNAFPO's rights to the IBPS system are hereby limited to
> its employment for the purpose of operating an electronic
> eProcurement system for the AFNAFPO organization.
> AFNAFPO's rights are continuous and nonexclusive.***

(*Id.* at 230) Ms. Runkle testified that this was an update of the "initial language" attached
to the 9 April 2004 email (tr. 2/232; supp. R4, tab 100 at 10018). Ms. Runkle recalled
that when "they" were reviewing Modification No. M0015 (Mod. M0015) they asked that
the language "perpetual license" not be used because "[w]e were not paying licensing for
IBPS and that is why we requested that we not use the term perpetual license in the
modification" (tr. 3/27). Ms. Runkle explained, "[w]e paid to have the application
developed. It belonged to us, we wanted it, it was ours....[T]he whole idea of developing
IBPS [was] so that they would not have to pay costs to use the system." (Tr. 2/234)
She testified that the word "continuous" that replaced the word "perpetual" meant the
same thing – "[c]ontinuous being forever" (tr. 2/235-36).

11.   In a 5 January 2005 email to Mr. Stock (SusQTech), Ms. Runkle asked about
the intellectual property language, "[i]n my layman's terms I take this to mean that 'the
second reference of AFNAFPO', encompasses not only AFNAFPO but all DOD NAFs
using IBPS in its current instance" (R4, tab 60 at 227). Mr. Stock replied:

> Your understanding is correct. If Navy NAF engages you,
> and therefore hopefully SusQtech, to build significant new
> functionality into IBPS, and that new functionality is built
> into your instance of IBPS, you are within the terms of this
> agreement. If any NAF organization within DoD wants to
> leverage your instance of IBPS to purchase the products you
> have under contract, you are within the terms of this

agreement. I do not think you are limited to who may use
your instance of the application, as long as it is your instance.

(*Id.*) Ms. Runkle explained that AFNAFPO wanted to be sure that other services within
DoD could use the Air Force NAF's instance[3] of IBPS at no cost to them and she was
satisfied with Mr. Stock's response (tr. 2/241).

12.   By Mod. M0015, dated 31 January 2005, AFNAFPO and SusQTech
incorporated an intellectual property rights clause in the IBPS contract:

The purpose of this modification is to incorporate the
following Intellectual Property Rights to the contract for the
IBPS system.

AFNAFPO's rights to the IBPS system are hereby limited to
its employment for the purpose of operating an electronic
eProcurement system for the AFNAFPO organization.
AFNAFPO's rights are continuous and non-exclusive.

All source code used for the development and deployment of
the IBPS system will be placed in escrow and updated in
conjunction with the deployment of new software versions.
In the event Susquehanna Technologies, Inc. ceases
operation, is acquired or merged, or should AFNAFPO
choose to either support and build upon the IBPS system
itself, or engage a third party to provide support and
enhancements for AFNAFPO, AFNAFPO is granted
authorization to retrieve all source code from the escrow
system.

All deliverables and other materials created by Susquehanna
Technologies, Inc. in the course of performance of its
obligations hereunder, including, without limitation, the
project components, all software object and source code,
developer tools, and user manuals (collectively the
"Deliverables"), shall remain the intellectual property of
Susquehanna Technologies, Inc. Susquehanna Technologies,
Inc. reserves the right to resell and distribute said intellectual
property. AFNAFPO shall not sell, transfer or assign
Deliverables to any third-party, nor will it allow any

---

[3] "Instance" is synonymous with "version."

> third-party to use Deliverables in whole or in part other than
> to support AFNAFPO. AFNAFPO retains the right to allow
> other DoD NAF entities to become users only on the existing
> instance of AFNAFPO IBPS. All rights not hereby
> specifically granted to AFNAFPO shall remain the sole
> property of Susquehanna Technologies, Inc.

(R4, tab 24) No money was placed on the contract by Mod. M0015.

13. Ms. Runkle wrote Mod. M0015 (tr. 2/247). She testified that Mod. M0015 "was the end result of the two years worth of effort on the language" (tr. 2/248). She testified that the paragraph starting with "AFNAFPO's rights to the IBPS system" meant, "[w]e, AFNAFPO, would have the right to continue forever to use the source code for the operation of our electronic eProcurement System known as IBPS" (tr. 2/248-49). Ms. Runkle testified that the paragraph starting with "[a]ll source code use for the development and deployment of the IBPS system" was intended to insure that AFNAFPO would always have access to the IBPS source code in escrow (tr. 2/249-50).

14. Ms. Jones is the deputy chief of AFNAFPO (tr. 2/161). From 1999 to 2001 she was IBPS project team lead and from 2001 to 2004 she was branch chief of the policies and procedures branch that was responsible for IBPS (tr. 2/164-65). In 2004 she was promoted to deputy director (tr. 2/166). Ms. Jones remained involved in IBPS when Mod. M0015 was signed (tr. 2/184). Ms. Jones testified that "Mod 15 gave us the right to use IBPS forever" (tr. 2/193).

15. In 2005 Mr. Henson was branch chief of the business systems section of AFNAFPO and he held an unlimited contracting warrant (tr. 3/63-64). He signed Modification M0022 and in preparation reviewed Modification M0015. Mr. Henson testified that Mod. M0015 addressed three points. The first, in paragraph one, "talks about the continuous use of IBPS and the rights of AFNAFPO to use that Software." (Tr. 3/65) The second paragraph "talks about source code and placing it in escrow" (*id.*). The third paragraph talks about SusQTech's rights in the software (tr. 3/65-66). He understood that AFNAFPO "had the right to use it [IBPS] forever and without any restriction" (tr. 3/66, 108).

Asset Purchase Agreement

16. The record contains a 12 July 2005 email to Mr. Carr, founder and CEO of DSI (tr. 1/66), and Mr. Tuttle, DSI's senior contracts administrator for most of DSI's involvement with AFNAFPO (tr. 2/19), forwarding a draft letter of intent and transmittal letter, on DSI letterhead, from Mr. Carr to Mr. Brubaker, Acting CEO SusQTech (R4,

tab 101). The draft letter documented DSI's interest in purchasing SusQTech's IBPS software. The draft transmittal letter included the following language:

> The fact that the IP involved in the software is owned both by SusQTech and the Government. This places the customer (the government) in a very strong negotiating position since they can indeed "walk away", greatly reduces any intrinsic value of the software and also diminishes the value of the contract vehicle.

(R4, tab 101 at 3199)

17. On 29 July 2005, DSI and SusQTech entered into an Asset Purchase Agreement whereby DSI purchased "All right, title and interest" in SusQTech's intellectual property in IBPS for $50,000 (app. supp. R4, tab 214 at 6336-47; tr. 1/119).

Events Leading Up to the Novation

18. Mr. Carr testified he had no intent to simply step into SusQTech's shoes (tr. 1/129), and if DSI was to take over the IBPS contract he wanted to "start fresh" (tr. 1/131). He testified that he wanted to know if AFNAFPO had a license to use IBPS and to that end they looked for the words "term" or "perpetual" or other wording that would "have given us a clue that there was some, something that would be important to us" (tr. 1/139). Mr. Carr relied upon Mr. Tuttle to investigate AFNAFPO's usage rights in IBPS (tr. 1/138-39). Mr. Tuttle did the in-depth review of the contract and Mr. Carr would look at things Mr. Tuttle brought to his attention (tr. 1/200-01, 203-04). Mr. Tuttle read Mod. M0015 and did not see the word "perpetual"; he interpreted the language "AFNAFPO's rights are continuous and non-exclusive" to be different than "perpetual" rights. He testified about his interpretation of Mod. M0015, "[b]ecause continuous in my mind, doesn't mean perpetual. Continuous can mean 7-24, 365, right to use, until the contract ends. That's a reasonable interpretation." (Tr. 2/31; R4, tab 210) Mr. Tuttle does not recall discussing Mod. M0015's intellectual property rights with AFNAFPO (tr. 2/124-25). Mr. Carr recalled:

> What we found was in essence a bounded contract, that pretty much, from my perspective, was a lease arrangement, okay, that when it ended, everything ended with it, and that's exactly what we wanted. That was good, you know, from our perspective.

(Tr. 1/139-40)

19.   On 6 July 2005, Mr. Doug Miller, SusQTech, sent an email to Mr. Tuttle with a copy to Mr. Carr.  The email included the following:

> AFNAFPO has long held the belief that SusQtech and its predecessors owned the IBPS intellectual property. *Mod 15 was executed at the request of AFNAFPO to clarify their perpetual rights to use the application and ability to establish other NAF organization users on the system.*  Based on proximity of several Air Force and Navy bases throughout the world, AFNAFPO has expanded the user base of the system to include naval installations to enhance purchasing efficiency and buying power of both units.

(R4, tab 102 at 1002-03) (Emphasis added)  Mr. Carr testified about this email:

> The second sentence puts, I guess, him [Tuttle] on notice that Mr. Miller's belief is that Mod 15 was executed to clarify the perpetual rights to use the application, and ability for other NAF systems.
>
> That's Mr. Miller's opinion, and I'm positive Pete [Tuttle] would have looked in the language of the mod, and I don't believe he would have taken Mr. Miller at his word, nor if that was the case, it would have simply had bearing to him as we negotiated Mod 22.  I mean this is strictly, you know, Doug's [Miller] opinion of this, and you know, that's what it is.

(Tr. 1/232-33)  Concerning "Doug's opinion," Mr. Carr testified that he had no reason "to believe it or disbelieve it" and it had "no bearing" on DSI's negotiations with AFNAFPO (tr. 1/233).  He testified that what Doug thinks "doesn't matter" (tr. 1/234), and:

> I mean there's nothing here in terms of what was meant by it, you know.  If the government had assumed that or they wanted that, I mean I assume at any point in time they could have brought up the words.  I mean I don't know why the onus is always, you know, from your perspective seems to be on me to have them be informed of every little thing.

(*Id.*)

20. Mr. Tuttle reviewed the contract between SusQTech and AFNAFPO to assess risks for Mr. Carr (tr. 2/20-21). He reported the results of his analysis to Mr. Carr via a 7 July 2005 email that included:

> c. <u>Intellectual Property</u>. Mod 15 says contractor owns it and AFNAFPO is restricted from selling, transferring or assigning to a third party. Also limits third party usage. *HOWEVER, it also says AFNAFPO requires a S/W Escrow and the language gives AFNAFPO great discretion in what to do with the escrowed SW.* An escrow will be required, per DM, by the time of R4 delivery. **DSI needs to have this escrow language changed and use our existing escrow on this deal.**

(Tr. 2/22; app. supp. R4, tab 211 at 86) (Italics added) Mr.Tuttle does not think he saw Mr. Miller's 6 July 2005 email before he sent his analysis to Mr. Carr because he did not mention the "perpetual rights" to use in the analysis (tr. 2/27, 112). He testified about Mr. Miller's 6 July 2005 email that included the "perpetual rights" language. Mr. Tuttle understood that AFNAFPO and SusQTech believed that AFNAFPO's right to use IBPS extended beyond the term of their contract. (Tr. 2/24) Mr. Tuttle did not recall if he discussed Mr. Miller's 6 July 2005 email with Mr. Miller (tr. 2/103-04). Mr. Tuttle does not recall if he ever discussed his risk analysis (app. supp. R4, tab 211 at 085-87) with AFNAFPO even though meeting with AFNAFPO was one of his recommendations to Mr. Carr (tr. 2/21, 119-20; app. supp. R4, tab 211 at 87).

21. Mr. Tuttle drafted the novation agreement between DSI and SusQTech that included the language in paragraph (a)(1):

> The term "the Contract," as used in this Agreement, means the above Contract and modifications made between the Government and SMC before the effective date of this Agreement, and includes Modification M01 through M0021. Modifications M01 through M0007, M0009, M0010 (FY04 maintenance portion), M0011, M0015, M0019 and M0020 are complete and accepted by the Government.

(App. supp. R4, tab 214 at 6331) Mr. Tuttle testified that this language "essentially killed Mod 15" (tr. 2/31). He testified that DSI was "absolutely not going to step into SusQTech's shoes" and that he put limitations in the novation (tr. 2/35). In novation paragraph (a)(1) he listed modifications, including Mod. M0015, as "complete and accepted by the Government" (app. supp. R4, tab 214 at 6331). By that he meant, "[t]hat there are no further expectations on the part of the Government for anything regarding

those mods, including deliverables....I was trying to mitigate the open ended nature of AFNAFPO's understanding of the rights. Meaning, if they thought they had perpetual rights and it was tied into Mod 15, then that sentence ends those rights. It bounds them." (Tr. 2/36-37, 131) His intent was to "kill" all of the rights, duties or obligations arising out of Mod. M0015 (tr. 2/40). However, this intent was not communicated to AFNAFPO.

22.  By email dated 11 August 2005, Mr. Tuttle sent Mr. Henson, AFNAFPO, a signed[4] version of the novation agreement between SusQTech and DSI (app. supp. R4, tab 214 at 6331-47). The novation included the language in paragraph (a)(1), "[m]odifications M01 through M0007, M0009, M0010 (FY04 maintenance portion), M0011, M0015, M0019 and M0020 are complete and accepted by the Government" (R4, tab 214 at 6331). Mr. Tuttle did not recall discussing his draft novation agreement with AFNAFPO (tr. 2/130; app. supp. R4, tab 214 at 6631-34). Mr. Henson recalls receiving the 11 August 2005 email from Mr. Tuttle transmitting a draft novation agreement between DSI and SusQTech (tr. 3/67; app. supp. R4, tab 214 at 6329-34). The purpose of the draft novation was to replace SusQTech with DSI (tr. 3/67). On 19 August 2005, Mr. Henson sent an email to Ms. Jones, Mr. Sawyer and Ms. Runkle with an attachment listing concerns about the novation agreement he received from Mr. Tuttle (tr. 3/68; app. supp. R4, tab 222). The first "concern" listed was:

> (a) 1 M0015 Intellectual Property rights for IBPS. That source code used for the development and deployment of the IBPS system will be place [sic] in escrow and updated in conjunction with deployment of new versions. With each software update, the code will change. M0015 is not completed as stated in the subject paragraph. This requirement will end only when IBPS is complete with no further changes or updates.

(App. supp. R4, tab 222 at 10836) Mr. Henson testified Mod. M0015 was not complete for the purposes of the escrow and AFNAFPO wanted the "requirement to go forward and not be complete" and "[s]o the duty for the contractor to place code in escrow is what we are trying to convey here" (tr. 3/69). On cross-examination he explained further, "[w]hat I am saying here, if you read the document, it is talking about source code being placed in escrow and that if you do away with Mod M0015, you are doing away with escrow deposits. So if you don't - - Mod 0015, if we are still doing development, you can't stop the requirement for escrow deposits." (Tr. 3/113-14) In reviewing paragraph (1) of the draft version of the novation sent to Mr. Henson by Mr. Tuttle, Mr. Henson

---

[4] Although the novation was signed, it was considered a draft by Mr. Henson, Branch Chief, AFNAFPO (tr. 3/67).

believed that DSI thought that their duties under Mod. M0015 had ended and he did not agree and changed the novation to clarify (tr. 3/104). Mr. Henson testified:

> The rights we had already established were continuous forever. So we didn't - - there was never any question about what our rights were under Mod M0015.
>
> So the only thing that could be complete or completed or any duty of the contractor at that point would be the escrow. And that is clearly outlined in the notes that we assessed and put together and wrote language to try to address.

(Tr. 3/105) Mr. Henson recalled that in negotiating the novation, DSI had specific requests to deal with stop work orders so that the work could be resumed (tr. 3/84).

23. Ms. Jones received a copy of the draft novation agreement from Mr. Hamer, DSI (tr. 2/186; app. supp. R4, tab 215). She recalled that in discussing the novation the IBPS team wanted to "lay out what work was left to be done on the contract" (tr. 2/186-87, 196). She did not interpret the novation as an attempt by DSI to "curtail rights and duties listed under Modification 15" (tr. 2/188). However, at the hearing Ms. Jones was confronted with the deposition testimony where she testified that AFNAFPO changed the language referring to Mod. M0015 in the draft novation because the IBPS team was concerned "if they said that was closed that they would be taking away what we had just put into Mod 15, which gave us the right to use IBPS software" (tr. 2/190). Ms. Jones testified that "Mod 15 gave us the right to use IBPS forever" (tr. 2/193). She testified that the language in the draft novation that Mod. M0015 was "complete and accepted by the Government" was "one of our major concerns in there because we needed to make sure that we had the right to get the software if we ever needed the source code" (tr. 2/193-94). She also testified that they were concerned "[t]hat we would be able to continue to use IBPS" and "we wanted to continue to be able to go forward and use it forever" (tr. 2/195-96).

24. By email dated 26 August 2005, Mr. Henson sent Mr. Tuttle a revised version of the novation agreement in FAR format (tr. 3/69-70; app. supp. R4, tab 223). Paragraph 4 contained revised language written by AFNAFPO:

> 4. Modification M0015 shall remain in effect but will be changed to reflect DSI in lieu of "Susquehanna Technologies". This modification is valid for the entire life of the contract and will not be considered complete until the contract is closed.

(App. supp. R4, tab 223 at 1921; tr. 3/70-71) Mr. Henson explained the purpose of paragraph 4, "[a]gain, going back to the concerns that were outlined at the time, my

understanding of this language is address those concerns that we had in that last document, meaning that escrow agreement, having code in escrow. The requirement of DSI to place code in escrow." (Tr. 3/71) Mr. Henson testified, "[t]here were never any discussions at the time regarding our continuous use rights during the negotiation for the drafting of language associated with Mod M0022" (tr. 3/71-72). Mr. Henson testified that he "[a]bsolutely [did] not" have any intention to limit AFNAFPO's right to use IBPS (tr. 3/72). DSI never suggested that AFNAFPO would have to pay a fee to use IBPS (tr. 3/73). Ms. Runkle testified that AFNAFPO never gave up its right to use IBPS (tr. 3/61).

25.   Mr. Tuttle recalled that AFNAFPO wanted the novation agreement to be in a FAR format and sent DSI a copy of the novation agreement in a 26 August 2005 email (tr. 2/44-46; app. supp. R4, tab 223). He couldn't recall if he discussed the novation with Mr. Henson (tr. 2/45). Mr. Tuttle testified that his interpretation of paragraph 4 of the novation agrreement meant at the end of the contract "[i]t was done. No further expectations." (Tr. 2/47-49) Mr. Tuttle does not recall discussing future right to use or licensing fees for the IBPS with AFNAFPO when negotiating Modification No. M0022 (tr. 2/134-35). Mr. Tuttle has no recollection of discussing the final novation agreement with AFNAFPO other than what is in emails in the record[5] (tr. 2/136-37).

Modification No. M0022

26.   On 30 September 2005, SusQTech (Transferor), DSI (Transferee), and the AFNAFPO contracting officer (CO) signed the novation agreement transferring the 0027 contract to DSI (R4, tab 32).

27.   Modification No. M0022 (Mod. M0022), effective date 5 August 2005 and executed by CO Henson on 4 October 2005, incorporated the novation agreement into the contract (R4, tab 31; tr. 3/63-64; app. supp. R4, tab 233). The purpose of Mod. M0022 was to incorporate the novation agreement recognizing DSI as the new contractor (tr. 3/64-65). The modification contained 12 paragraphs listing all prior modifications and indicating the present status of completion of each and DSI's responsibility, if any, for each (*id.* at 105). For example, paragraph 1 stated that "Modifications M0001 through M0007, M0009, M0010 (FY04 maintenance portion), M0011, M0019 are complete and accepted by the Government." Paragraph 4 dealt with Mod. M0015:

> 4.  Modification M0015 shall remain in effect but will be changed to reflect DSI in lieu of "Susquehanna

---

[5] Mr. Tuttle testified that the documents at app. supp. R4, tabs 226 to 232, reflect his negotiations with AFNAFPO concerning Modification M0022 (tr. 2/50-51). Nothing in these documents discloses Mr. Tuttle's intent to end AFNAFPO's perpetual right to use IBPS.

Technologies". This modification is valid for the entire life
of the contract and will not be considered complete until the
contract is closed.

(R4, tab 31 at 105) While no money was obligated by Mod. M0022, it recognized that
DSI was entitled to invoice for unpaid completed work up to and including Mod. M0020
and any "withheld amount or retainage upon the acceptance of R4 [Release 4]"
(R4, tab 31 at 106).

28.    Mr. Carr signed Mod. M0022 for DSI (R4, tab 31). Mr. Carr did not
personally negotiate Mod. M0022 with AFNAFPO (tr. 1/287, 304). Mr. Carr testified that
Mr. Tuttle negotiated the terms and conditions of Mod. M0022 with AFNAFPO (tr. 1/147,
154, 213-15 ). Mr. Carr testified that there had been negotiations leading to Mod. M0022:

> In other words, we had gone through the entire contract. We
> had listed and gotten joint agreement as to all of the things
> that we should close down. We had negotiated back and
> forth. We had entertained the government's counterproposals
> and Mod 22 was a clean step forward for us.

(Tr. 1/145) Mr. Carr testified about paragraph 4 of Mod. M0022:

> If I look at paragraph four and I read it, this looks like a
> specific negotiation on Mod 15. Again, you would have to
> talk to Mr. Tuttle about, you know, the mechanics of that and
> what went back and forth. It looks to me like this is a
> clarification on Mod 15, that Mod 15 is again is valid for the
> life of the contract, which would mean to be at the end of the
> contract, that it would become closed and done.

(Tr. 1/153) Paragraph 12 of Mod. M0022 reads:

> DSI's liabilities and obligations are limited to the
> requirements set forth in this Modification M0022. DSI shall
> have no liability or obligation for any claims and demands
> under contract F41999-99-C-0027 arising prior to the
> effective date of this modification. This limitation shall not
> apply to any future obligation or liability under said contract
> as modified by Modification M0022.

(R4, tab 31 at 106) Mr. Carr testified that he felt Mr. Tuttle did a good job of wording
paragraph 12 "in terms of clearly limiting the fact that we had no liabilities or obligations

of anything in the past" (tr. 1/149-50). Mr. Carr understood that AFNAFPO's right to use IBPS was limited to the duration of the contract by Mod. M0022 (tr. 1/155).

29.   Mr. Tuttle does not recall ever telling anyone at AFNAFPO that DSI could not "live with" AFNAFPO perpetual rights to use IBPS or that the intent of Mod. M0022 was to "kill" Mod. M0015 and end any perpetual rights to use IBPS that AFNAFPO might have (tr. 2/154-55). He does not recall discussing the future right to use IBPS or licensing fees for the IBPS with AFNAFPO when negotiating Mod. M0022 (tr. 2/134-35).

Modification No. M0029

30.   Mod. M0029, dated 1 October 2006, extended the period of performance of contract 0027 to 30 September 2007 and added a maintenance agreement and other provisions (R4, tab 43 at 152). It included the following:

> 9) Intellectual Property Ownership, Right-to-Use and Escrow
>
> The rights and responsibilities of the Parties in regards to intellectual property ownership, right-to-use and escrow in Modifications M0015 and M0022 remain in full force.

(R4, tab 43 at 153) Mr. Max Browning, Contract Specialist, drafted Mod. M0029 based on DSI's request to be allowed to continue performance another year to "stabilize" the IBPS software (tr. 3/163). Mr. Browning recalled that Mr. Tuttle said, "Max, we are concerned about you to continue to recognize our rights of ownership and we will continue to recognize your right to use" (tr. 3/165). Mr. Browning testified that paragraph 9 "didn't alter our rights under Mod M0015 and it recognized in Mod M0022" that DSI owned the software (tr. 3/165).

Amendment 1 to Rider C

31.   Rider C to DSI's escrow agreement allows the escrow agreement to be used for IBPS without having to negotiate a new one (R4, tab 243 at 9318). Mr. Carr testified that Rider C to the escrow agreement had nothing to do with ownership or right to use IBPS (tr. 1/180-81).[6]

32.   Mr. Browning reviewed Escrow Agreement Rider C and expressed AFNAFPO's concerns in a 2 August 2006 email to Mr. Tuttle:

---

[6] In its brief DSI asserts Rider C confirms "AFNAFPO's limited right-to-use IBPS" (app. br. at 19).

> We have reviewed the attached Escrow Agreement and have
> the following concerns:  Clause 3, Beneficiary(s), states only
> active client Beneficiaries holding a current License
> Agreement with a fee paid Depositor shall have the right to
> request release of Deposit Materials (Source Code +).  Do we
> have a License Agreement with DSI?  There is no provision
> for any notice to us under Clause 4, Term, if this Escrow is
> terminated for any reason.  In both Clause 8, Section (e)
> and Clause 12, Section (c), there is language limiting our use
> of Deposit Materials to the terms of a GSA Schedule
> Right-to-Use License and Subscription Agreement.  The
> numerous concerns noted herein need to resolved [sic]
> through a revised Rider C to this Escrow Agreement or our
> rights to retrieve the Deposit Materials is imperiled.  Let me
> know if you wish to discuss.

(App. supp. R4, tab 243 at 9318)  Mr. Browning was concerned that Rider C talked about
a GSA license but AFNAFPO's license rights came from Mod. M0015.  He was
concerned about protecting, "[o]ur right to use continuously." (Tr. 3/148-49)  He
explained, "we had the right to pull escrow and use continuously free of charge, without
any restrictions, other than what was identified as our rights to protect DSI's intellectual
property and to use it within our own need for our procurement system" (tr. 3/149).  He
continued, "we wanted to make sure, undisputed that nothing in that escrow agreement
that had language that would impede us from pulling our escrow and use it as intended,
our right to use forever free, under Mod M0015" (tr. 3/150-51).

     33.   Mr. Browning testified that he discussed AFNAFPO's concerns with
Mr. Tuttle, "I told Mr. Tuttle that he needed to fix this Rider C to make sure that it
reflected our right to use and our ability to pull escrow as intended in Mod M0015.
Mr. Tuttle concurred and complied." (Tr. 3/152)  On 7 August 2006, Mr. Tuttle emailed
Mr. Browning Amendment 1 to Escrow Rider C stating, "I think it addresses the
concerns that were mentioned (see yellow highlights)" (app. supp. R4, tab 245 at 3657).
Paragraph 2 of the revised Rider C reads, "The Depositor's sole ownership of IBPS and
Beneficiaries Right-to-Use are per AFNAFPO Contract F41999-99-C-0027,
Modification M0015 as modified by Modification M0022" (app. supp. R4, tab 245 at
3663).  Mr. Browning was asked about the language "Modification M0015 as modified
by Modification M0022" and testified, "[w]ell my understanding that if Mod M0015
stood on its own, it says Susquehanna has the rights to the ownership.  Mod M0022 just
identified the new owner." (Tr. 3/156)

Delivery Order No. 1375

34.  In September 2007, AFNAFPO determined that it desired DSI to continue
IBPS maintenance.  Rather than extending contract 0027 which expired 30 September
2007, AFNAFPO planned to issue an order against DSI's GSA schedule contract.  (R4,
tab 78)  The record contains a 20 September 2007 maintenance proposal from DSI that
states in part:

### 2  Proposal

DSI proposes a Firm Fixed Price (FFP) effort to include very
limited DSI project management and coordination/analysis
which will allow DSI to place the vast majority of the effort
on code development, code testing and software builds
necessary to complete work assignments that will originate
and be managed by AFNAFPO.

DSI also proposes that the escrow materials as of 9/30/2007
will be deposited with the escrow agent.

....

### 8  Escrow Materials

Since this effort is to be performed under an entirely
new order, DSI proposes that the parties agree that the
resultant order includes language that ensures that the
understandings, agreements, duties and responsibilities of the
parties in F41999-99-C-0027, Modifications 15, 22, 29 and
the Rider C of the Escrow Agreement survive the end of
F41999-99-C-0027 and are carried forward into the new
order.

### 9  Pricing

....

[CLIN]
0001  Technical Support consisting of one                $202,392.00
       (1) DB-Level VI Customization
       (SIN 132-32) per month for eight (8) months

| 0002 | Program Management Support consisting of one (1) DB Level II Customization for eight (8) months | $2,754.00 |
| 0003 | Escrow of Deposit Materials (Open Market) | $2,000.00 |

(R4, tab 64 at 242, 244)

35.    On 26 September 2007, AFNAFPO issued Delivery Order No. F41999-07-F-1375 (DO 1375) under a GSA schedule contract for:

| [CLIN] | | |
| 0001 | GLAC 1850000 IBPS Technical Support consisting of one (1) Level VI Customization per month for eight (8) months See Attached Statement of Work | $202,392.00 |
| 0002 | GLAC 1850000 Program Management Support consisting of one (1) Level II Customization for eight (8) months | $2,754.00 |
| 0003 | GLAC 1850000 Escrow deposit | $2,000.00 |

(R4, tab 62) Mr. Browning issued DO 1375 for continued maintenance on the IBPS software for eight months (tr. 3/169; app. supp. R4, tab 276 at 3297). The total amount of the Order was $207,146 (*id.*). Although CLIN 0001 references "See Attached Statement of Work," DSI received a FAX copy of the Order that apparently did not include the SOW (R4, tab 66 at 249). There is no statement of work with the copy of the Order at Rule 4, tab 62.

36.    DSI prepared a "Revised" version of DSI's Maintenance Proposal entitled, "Air Force NAF Purchasing Office Maintenance Proposal (Revised)," dated 26 September 2007 (the same date as Order 1375), but paragraph eight was re-titled and stated as follows:

## 8 Intellectual Property Rights & Escrow Process

....

DSI Rights:

DSI is the sole and exclusive owner of IBPS and all
customizations, modifications and updates thereto, including
without limitation, the project components, all software
object and source codes, developer tools, and user manuals
(collectively the "IBPS Intellectual Property"). DSI, as sole
owner of the IBPS Intellectual Property, retains the exclusive
right to re-use, modify, update or otherwise change, modify,
customize and update the IBPS Intellectual Property. DSI
retains all rights in the IBPS Intellectual Property including
but not limited to the right to utilize, resell, license and
distribute the IBPS Intellectual Property, its processes and
technology for purposes and projects unrelated to
AFNAFPO.

AFNAFPO Rights:

During the term of this Agreement, AFNAFPO shall have
nonexclusive right to use IBPS Intellectual Property in the
operation of its electronic eProcurement System. AFNAFPO
shall not sell, transfer or assign of [sic] IBPS Intellectual
Property to a third party, nor will it allow any third party to
use IBPS Intellectual Property in whole or in part other than
to provide support for the AFNAFPO eProcurement System.
AFNAFPO shall have the right to allow other DoD NAF
entities to become users of its eProcurement System subject
to the terms of this agreement including any additional
compensation due to or to become due to DSI. All rights not
hereby specifically granted to AFNAFPO shall remain the
sole property of DSI.

Escrow:

DSI and AFNAFPO agree the two party escrow agreement
entered into between DSI and Escrow Associates dated
February 14, 2005 and the Rider C (Amendment 0001)
entered into between DSI and Escrow Associates dated

> August 10, 2006 shall remain in full force and effect with
> respect to this Agreement and all related orders. DSI and
> AFNAFPO further agree that the Rider C Amendment 0001
> dated August 10, 2006 will be amended to add the new order
> number, but in the interim, the heretofore mentioned escrow
> agreement and Rider C shall remain in effect and shall be
> deemed to include this order number.

> AFNAFPO may request a maximum of four (4) escrow
> deposits be made during the period of performance.

(R4, tab 68 at 256)

  37.  On 28 September 2007, Mr. Tuttle emailed Mr. Browning stating that DO
1375 did not include a SOW:

> We are in receipt of order (attached), however it did not
> reference any of the proposed language regarding IP
> ownership and the escrow process that we discussed or that
> was included in our proposal (also attached). The fax we
> received did not contain the SOW referenced in the order so
> we were unable to verify whether or not AFNAFPO accepted
> our proposal and/or included the language required by DSI as
> part of the follow-on contract/order to transition the IP
> protections, etc. from the previous contract per our
> discussion.

> I've left you a voicemail but want to back it up with this note.
> The order transmitted via fax to DSI yesterday does not appear
> to reflect the discussion points or the intent of the parties.

> Hopefully, this was simply an administrative oversight on the
> part of AFNAFPO while cutting the order.

> Please contact me ASAP so we can sort through this today.

(R4, tab 66 at 249; app. supp. R4, tab 276 at 3294)  AFNAFPO responded stating, "We
are in agreement with your proposal and will be sending an admin mod it [sic]
incorporate" (R4, tab 66 at 248).  Mr. Browning testified that Mr. Tuttle was concerned
that the parties continued to recognize their respective rights and that there was no
mention of changing or altering rights (tr. 3/177-78).

38.   On 1 October 2007, AFNAFPO issued unilateral Modification No. M0001 (Mod. M0001) to DO 1375 stating, "The purpose of this modification is to incorporate the attached Statement of Work (SOW) 'Air Force NAF Purchasing Office Maintenance Proposal (Revised)['] dated September 26, 2007 to the Delivery Order" (R4, tab 67). There was no change in the price of the order associated with the modification. The unilateral modification was signed only by CO Browning. (*Id.*) Mr. Browning used an "administrative mod" to add the SOW. He testified that if Mr. Tuttle, "had brought up to me at any one point during this process that our rights were going to cease or change, that delivery order would have been retracted and it would have been nullified immediately." (Tr. 3/179)

39.   Mr. Browning testified about the first sentence in paragraph 8 Intellectual Property Rights & Escrow Process, AFNAFPO Rights, of the 26 September 2007 maintenance SOW that read, "During the term of this Agreement AFNAFPO shall have nonexclusive right to use IBPS Intellectual Property in the operation of its electronic eProcurement System" (app. supp. R4, tab 276 at 3317). Mr. Browning explained that based on what Mr. Tuttle told him he understood that DSI primarily wanted to "capture their rights in the new code that was going to be developed and I had no problem with that" (tr. 4/25). He stated, "[i]f he [Mr. Tuttle] would have identified any change or intent of a word, then we would have had a serious discussion about it" (tr. 4/26). As to the first sentence he testified, "I gave it no weight, you know. I had no reason to know or predict it had any limitation on our rights." (Tr. 4/27) When asked on cross-examination, "[t]hat sentence does not provide the right to use the IBPS system continuously forever as you just testified. Correct?" Mr. Browning replied, "[t]hat's not my opinion. That's not my interpretation." (Tr. 4/29) He also stated "I did not view this language as changing our rights" (tr. 4/30). The following exchange occurred during cross-examination:

> Q. You viewed the language as consistent with the rights to use the IBPS system as you have testified previously?
>
> A. I see here AFNAFPO Rights and I go back to Mod 15 as modified as Mod 22 and the language in the escrow agreement that gives me the rights to pull at no cost without limitation, without an end date as the governing factors in my decision here. No indication, no discussion was ever conducted of altering our rights under Mod 15 as modified by 22 which gave you your rights, or DSI's rights, to the intellectual property.
>
> The sole purpose of me allowing them to put this in there so they could continue to capture their rights on any

new code that was developed beyond 30 September. At the
end of the eight months whatever code was developed, the
intention was that DSI would continue to own that since they
developed it and we had no objections to your ownership to
that property thereafter.

(Tr. 4/30-31) When asked if he discussed the first sentence with Mr. Tuttle,
Mr. Browning answered, "[t]here was no reason to discuss it. He never brought it up."
(Tr. 4/32)

40.   Mr. Browning was asked, "Did Mr. Tuttle or anybody else at DSI tell you
that the sentence 'During the term of this agreement AFNAFPO shall have non-exclusive
right to use IBPS intellectual property in the operation of its electronic eProcurement
System,' would result in the loss of your right to use when that delivery order
terminated?" He responded, "Absolutely not." (Tr. 4/44-45)

The Claim and Appeal

41.   On 28 April 2009, DSI submitted an invoice in the amount of $5,432,388.00
to AFNAFPO for two years of "Right to Use License" fees for IBPS[7] software (R4,
tabs 69, 70).

42.   On 10 June 2009, AFNAFPO returned DSI's invoice "without action" stating
that "AFNAFPO enjoys continuous and ongoing rights to use the IBPS software, as
evidenced by the escrow provisions which authorized AFNAFPO to retrieve the
software's source code for use in furtherance of AFNAFPO purposes" (R4, tab 71).

43.   On 15 June 2009, DSI responded to AFNAFPO's 10 June 2009 response to
DSI's invoice (R4, tab 72). DSI took the position that AFNAFPO's right to use IBPS
software license free existed only so long as AFNAFPO maintained a valid contract with
DSI (id.).

44.   On 26 January 2010, DSI submitted a certified claim to AFNAFPO,
referencing Contract 0027, including an invoice for $8,148,582.00 for three years of
"Right to Use License"[8] (R4, tabs 51, 52).

45.   On 18 March 2010, the AFNAFPO responded to DSI's claim stating in part:

---

[7] The invoice refers to "ProTrac Right to Use License" that is on the GSA schedule, but it
is clear in the "NOTES AND ASSUMPTIONS" that the invoice is for the use of
IBPS software.
[8] The invoice uses the "ProTrac Right to Use License" rate from DSI's GSA schedule.

The IBPS Software solution at issue was developed for
AFNAFPO by DSI's predecessor in interest (Judd's Online)
in accordance with the subject nonappropriated fund contract
[contract 0027], awarded in August 1999. Contract
Modification 15 (which was entered into by Susquehanna
Technologies, another predecessor in interest of DSI)
incorporated specified Intellectual Property Rights.
AFNAFPO was expressly afforded the "continuous and
non-exclusive" right to employ the IBPS solution to operate
an electronic eProcurement system for the AFNAFPO
organization. Moreover, Modification 15 required that all
source code used for the development and deployment of the
IPBS system be placed in escrow. AFNAFPO was granted
broad authority to retrieve the source code from escrow.
Specifically AFNAFPO could retrieve all source code from
escrow in the event that it should "choose to either support
and build upon the IBPS system itself, or engage a third party
to provide support and enhancements for AFNAFPO."
AFNAFPO's continuous rights also permitted the selling,
transferring and assigning of software deliverables (including
object and source code and developer tools) to any third party
to use in support of AFNAFPO activities only.

DSI became Susquehanna's successor in interest via a
novation agreement recognized in Modification 22. Per the
novation agreement, DSI was bound by the terms and
conditions of Susquehanna's contract.

(R4, tab 53) CO Browning found that DSI's claim "does not seek relief arising under the
subject contract, the claim is hereby dismissed" (*id.*).

46. On 16 June 2010, DSI filed its appeal with the Board and the appeal was
docketed as ASBCA No. 57266. The parties filed cross-motions for summary judgment.

47. On 28 December 2011, the Board issued a decision denying DSI's motion for
summary judgment and granting in part AFNAFPO's motion for summary judgment.
*DSI*, 12-1 BCA ¶ 34,917. On 14 September 2012, the Board granted DSI's motion for
reconsideration and vacated its 28 December 2011 decision and denied all motions.
*DSI*, 12-1 BCA ¶ 35,144. A hearing was held 4-7 June 2013.

DECISION

The Parties

AFNAFPO awarded Contract 0027 to Judd's on 19 August 1999 (finding 5). By novation, Judd's then transferred the contract to SMC Interactive, Inc., who then changed its name to SMC/BlazeNet and then to SMC/SusQTech (findings 7, 8). SusQTech, by novation dated 30 September 2005, transferred the contract to DSI (finding 26). The claim was submitted by DSI. We have jurisdiction to consider this claim and appeal pursuant to the Disputes clause of Contract 0027. (R4, tab 1 at 13)[9]

Contention of the Parties

DSI argues that AFNAFPO does not have perpetual right to use the IBPS for free. It contends that if AFNAFPO ever had such rights, they were extinguished by Mod. M0022, Mod. M0029 and DO 1375. It is undisputed by the parties that DSI owns the IBPS intellectual property. Therefore, according to DSI, AFNAFPO must pay it a license fee to continue using IBPS.

AFNAFPO argues that by Mod. M0015 the then parties to the contract, SusQTech and AFNAFPO, agreed that SusQTech owned the IBPS intellectual property and AFNAFPO enjoyed a perpetual right to use its version of IBPS for the purpose of operating its electronic eProcurement system for free. AFNAFPO contends that nothing that occurred after DSI took over the contract divested it of its perpetual right to use its version of IBPS for free.

Mod. M0015

At award, Contract 0027 did not include a provision defining the intellectual property rights of the parties. In Mod. M0015 the parties, SusQTech and AFNAFPO, defined their intellectual property rights in IBPS. The first version of the language, drafted by SusQTech, provided that "AFNAFPO retains a perpetual nonexclusive license to utilize the IBPS system for the purpose of operating an electronic eProcurement system within the AFNAFPO organization." (Finding 9) AFNAFPO had the language changed to "AFNAFPO's rights are continuous and nonexclusive" due to concerns over use of the word "license" but felt the new language afforded AFNAFPO the same rights

---

[9] At DSI's request, we vacated our decision granting partial summary judgment to AFNAFPO to allow DSI time to discover evidence to support its argument that it negotiated with AFNAFPO and AFNAFPO understood and agreed to ending its perpetual right to use IBPS, a meeting of the minds so to speak. The record reveals that DSI was unsuccessful in that endeavor.

as the initial language (finding 10). Before signing Mod. M0015, AFNAFPO verified that it had unlimited rights to use IBPS within DoD (finding 11).

AFNAFPO individuals primarily involved in negotiating Mod. M0015, Ms. Runkle, Ms. Jones, and Mr. Henson, each testified that Mod. M0015 provided AFNAFPO the right to use IBPS "forever" at no cost for the purpose of operating an electronic eProcurement system (findings 13, 14, 15). SusQTech likewise agreed that AFNAFPO enjoyed a perpetual right to use IBPS at no additional cost (findings 9, 11).

Since both parties to Modification M0015 agree that it bestowed on AFNAFPO a perpetual right to use IBPS, we hold that AFNAFPO enjoyed a perpetual right to use its version of IBPS for free.

Asset Purchase Agreement

On 29 July 2005, DSI purchased the IBPS intellectual property from SusQTech. (finding 17). During the negotiations over price leading up to the purchase, DSI apparently believed that both SusQTech and the "government" owned the IBPS intellectual property and that as a result the "government" could "walk away" from the contract (finding 16). DSI therefore understood, before it took over the contract, that AFNAFPO had significant rights in IBPS even though DSI was mistaken in believing AFNAFPO co-owned the IBPS intellectual property. This understanding, although mistaken, should have alerted DSI that AFNAFPO would protect its substantial interest in IBPS.

The Novation

Mr. Carr decided to take over Contract 0027 from SusQTech, but he did not want to "step into SusQTech's shoes" (finding 18). Mr. Carr relied upon Mr. Tuttle to review the contract and bring things of interest to his attention (*id.*). Mr. Carr was interested in what rights AFNAFPO had to use IBPS (*id.*). Mr. Carr testified that they would look for words such as "term" or "perpetual" to determine AFNAFPO's license rights (*id.*). Mr. Carr recalled that Mr. Tuttle found that AFNAFPO's rights were "bounded" and that was good from his perspective (*id.*). Mr. Tuttle testified that he did not interpret the language of Mod. M0015, "AFNAFPO's rights are continuous and nonexclusive," to be the same as "perpetual rights" (finding 21). We consider DSI's willingness to interpret Mod. M0015, a modification DSI had nothing to do with, without inquiring from either SusQTech or AFNAFPO as to its meaning, to be unreasonable. DSI assumed the risk that its unilateral interpretation was wrong – which it was.

By a 6 July 2005 email, Mr. Miller, SusQTech, informed Mr. Carr and Mr. Tuttle that AFNAFPO requested Mod. M0015 "to clarify their perpetual rights to use the application" (finding 19). Surprisingly, after having seeing the words "perpetual rights,"

the "clue" Mr. Carr was looking for, Mr. Carr dismissed Mr. Miller's email referring to it as his "opinion" and that it "doesn't matter" (*id.*). This testimony is irreconcilable with Mr. Carr's stated interest in AFNAFPO's rights to use IBPS and DSI's search for the word "perpetual" in that regard. Inexplicably, Mr. Carr preferred to rely on his and Mr. Tuttle's interpretation of Mod. M0015 rather than an interpretation from one of the parties that actually negotiated and signed the modification. He seemed to believe that DSI had no reason to tell AFNAFPO it was attempting to end AFNAFPO's perpetual rights to use IBPS, "I mean I don't know why the onus is always, you know, from your perspective seems to be on me to have them be informed of every little thing." (Finding 19) We do not consider AFNAFPO's perpetual rights to use IBPS and DSI's professed attempt to end those rights to be, in Mr. Carr's vernacular, a "little thing."

Based on the above, we conclude that on or about 6 July 2005, Mr. Carr and Mr. Tuttle were on notice that Mod. M0015 gave AFNAFPO perpetual rights to use the IBPS for free.[10] On 7 July 2005, Mr. Tuttle reported to Mr. Carr that AFNAFPO had "great discretion" to use escrowed software and advised that DSI should change the escrow language[11] (finding 20). Armed with this knowledge, Mr. Tuttle wrote the language stating that Mod. M0015 was "complete and accepted by the Government" in the draft novation specifically to "kill" AFNAFPO's perpetual rights to use IBPS (finding 21). Mr. Tuttle, however, never informed AFNAFPO that DSI intended this language to end AFNAFPO's perpetual right to use IBPS (findings 21, 22, 25).

Even though Mr. Tuttle did not disclose his intent to "kill" AFNAFPO's perpetual right to use IBPS, there was concern at AFNAFPO over the language of the draft novation. The main concern was that the escrow requirement could not end until software development concluded. (Findings 22-24) Ms. Jones also expressed her

---

[10] In its brief DSI acknowledges that it understood that "both AFNAFPO and SusQTech seemed to believe that the language of Modification 15 granted a perpetual right to use the current IBPS system" (app. br. at 37-38). DSI then argues, "[a]s a result, DSI clearly and unequivocally proposed the end to all rights and duties stated in Modification 15 by proposing that it be complete and accepted by the government before DSI stepped into the IBPS Contract" (app. br. at 38). If this were true, DSI might prevail – but it is not true. The language of paragraph 4 of Mod. M0022, "complete and accepted," is far from a clear and unequivocal statement communicating to AFNAFPO DSI's intent to divest AFNAFPO of its perpetual right to use IBPS. It is clear from the record that AFNAFPO did not know what DSI intended nor would it have ever agreed to give up its perpetual right to use IBPS. (Findings 22-24, 30, 32, 33, 37-40)

[11] Mr. Tuttle testified that he must not have seen Mr. Miller's 6 July 2005 email when he reported his analysis to Mr. Carr because he did not refer to "perpetual rights" (finding 20).

concern over AFNAFPO's ability to use the IBPS "forever" (finding 23). AFNAFPO revised the novation to satisfy these concerns, comply with FAR format and clarify the requirement to continue to place code in escrow (finding 24) Ms. Runkle, Mr. Henson, and Ms. Jones each testified credibly that AFNAFPO did not give up its right to use IBPS (findings 22, 23, 24). Mr. Tuttle, however, interpreted the new language to have the same effect as his language and end AFNAFPO's perpetual right to use IBPS at the end of Contract 0027 (finding 25). Mr. Tuttle did not disclose his interpretation to AFNAFPO (*id.*). The second, FAR formatted version, of the novation was signed on 30 September 2005 (finding 26).

Mod. M0022

     Mod. M0022, effective date 5 August 2005, incorporated the novation agreement into Contract 0027 (finding 27). It repeated the novation language that Mod. M0015 "is valid for the entire life of the contract and will not be considered complete until the contract is closed" (*id.*). Mr. Carr testified that paragraph 4 clarified Mod. M0015 and it would be "closed and done" at the end of contract 0027 (finding 28). He likewise testified about paragraph 12. Although Mr. Carr signed Modification M0022, we give little weight to Mr. Carr's testimony because he was not involved in the negotiations and never conveyed his interpretation to AFNAFPO. Mr. Tuttle, who actually negotiated Mod. M0022, also did not disclose to AFNAFPO his intent that Mod. M0022 "kill" AFNAFPO's perpetual right to use IBPS. (Finding 29)

     We are dubious that the phrase "[t]his modification is valid for the entire life of the contract and will not be considered complete until the contract is closed" can reasonably be interpreted on its face to divest AFNAFPO of its perpetual right to use IBPS, a right, according to DSI's claim, worth tens of millions of dollars over time. DSI, on notice that AFNAFPO had a perpetual right to use IBPS for free, endeavored to divest AFNAFPO of that right through the language of the novation and Mod. M0022 without disclosing its intention and interpretation to AFNAFPO. It now asks the Board to enforce its undisclosed interpretation and divest AFNAFPO of its perpetual right to use IBPS – this we will not do. It is well established that an undisclosed intent/interpretation is irrelevant in interpreting contract language. *Andersen Consulting v. United States & Computer Sciences Corp.*, 959 F.2d 929, 934 (Fed. Cir. 1992) ("[T]he 'subjective unexpressed intent of one of the parties' to a contract is irrelevant."); *ITT Arctic Services, Inc. v. United States*, 524 F.2d 680, 684 (Ct. Cl. 1975) (In attempting to give effect to the contracting parties' intent, the court will not consider the "subjective unexpressed intent of one of the parties.").[12]

---

[12] In its brief DSI argued that AFNAFPO failed to disclose its interpretation that paragraph 4 of Mod. M0022 only affected the escrow requirements (app. br. at 39-40), however, the dispute relates to DSI's interpretation that paragraph

Mr. Carr and Mr. Tuttle never "put their cards on the table" and explained to AFNAFPO that the only way DSI would take over the contract was if AFNAFPO gave up its perpetual rights to use IBPS. This entire dispute could have been avoided if DSI had simply clearly disclosed to AFNAFPO what it wanted.

Mod. M0029

Mod. M0029 included language similar to what we have seen before in Mod. M0022 (finding 30). We do not interpret this language to unambiguously state that AFNAFPO loses its perpetual right to use IBPS. DSI's true intent remained undisclosed. (*Id.*) Mr. Browning testified that Mod. M0029's language, "[t]he rights and responsibilities of the Parties in regards to intellectual property ownership, right-to-use and escrow in Modifications M0015 and M0022 remain in full force" did not "alter our rights." We agree. As stated above, DSI's subjective unexpressed interpretation is irrelevant.

Rider C

We agree with Mr. Carr that Rider C has nothing to do with AFNAFPO's right to use IBPS (finding 31). However since in its brief DSI contends Rider C supports its arguments, we briefly deal with it (*id.*).

Mr. Browning reviewed Rider C and expressed concerns (finding 32). He testified that he told Mr. Tuttle to "fix this Rider C to make sure that it reflected our right to use and our ability to pull escrow as intended in Mod M0015" and that Mr. Tuttle "concurred and complied" (finding 33). Mr. Tuttle emailed Amendment 1 to Rider C to Mr. Browning stating he thought he had addressed Mr. Browning's concerns (*id.*). DSI again relies on the language, "Modification M0015 as modified by Modification M0022" as support for its interpretation; we have already determined that this language does not unambiguously communicate to AFNAFPO that it lost its perpetual right to use IBPS and DSI's intent remained undisclosed. Mr. Browning was asked about the language and testified "Mod M0015 stood on its own" and "Mod M0022 just identified the new owner." (*Id.*) We conclude there is nothing in Rider C that supports DSI's position.

DO 1375

We must also consider the interpretation of the language in Mod. M0001 to DO 1375. The original 20 September 2007 Statement of Work (SOW) for the maintenance effort included paragraph "**8 Escrow Materials**" that recited "[m]odifications 15, 22, 29 and the

---

4 divests AFNAFPO of its perpetual right to use IBPS, an interpretation that was never disclosed to AFNAFPO.

Rider C of the Escrow Agreement survive the end of F41999-99-C-0027 and are carried forward into the new order" (finding 34). DO 1375 was issued on 26 September 2007 in the amount of $207,146 to provide an additional eight months of technical support, program management support and to pay for escrow deposits according to the original SOW (finding 35). Also on 26 September 2007, DSI revised its maintenance proposal SOW rewriting paragraph eight and changing the name from "**Escrow Materials**" to "**Intellectual Property Rights & Escrow Process**" (findings 34, 36). The new version of paragraph 8 included a subparagraph entitled "AFNAFPO Rights" that included the language, "[d]uring the term of this Agreement, AFNAFPO shall have nonexclusive right to use IBPS Intellectual Property in the operation of its electronic eProcurement System" (finding 36).

On 28 September 2007, DSI emailed AFNAFPO stating that it had received a fax copy of DO 1375 that did not contain a copy of the SOW (finding 37). DSI stated that it was "unable to verify whether or not AFNAFPO accepted our proposal and/or included the language required by DSI as part of the follow-on contract/order to transition the IP protections, etc. from the previous contract per our discussion." DSI also stated, "[t]he order transmitted via fax to DSI yesterday does not appear to reflect the discussion points or the intent of the parties." (*Id.*) AFNAFPO responded to DSI's 28 September 2007 email on the same day stating "[w]e are in agreement with your proposal and will be sending an admin mod it [sic] incorporate" (*id.*). On 1 October 2007, AFNAFPO issued unilateral administrative Mod. M0001 to DO 1375 incorporating the 26 September 2007 revised SOW (finding 38). It is the language of the 26 September 2007 revised SOW that DSI relies upon to support its argument that AFNAFPO's perpetual rights to use IBPS ended when DO 1375 ended.

DSI's reliance is misplaced. That AFNAFPO's rights were to be maintained "during the term of the agreement," says nothing about the status of those rights thereafter. Given the importance of this matter and the potential monetary impact involved, if DSI intended that AFNAFPO's perpetual rights be terminated at the expiration of DO 1375, it should have used such language. It did not do so. Mr. Browning understood that the purpose of the SOW was to ensure that DSI had ownership to any new software developed during the performance of DO 1375, "[t]he sole purpose of me allowing them to put this in there so they could continue to capture their rights on any new code that was developed beyond 30 September (finding 39). He testified that if he had any indication that DSI was trying to end AFNAFPO's perpetual rights to use IBPS he would have "retracted" and "nullified" DO 1375 (finding 38). Based on the same case law we cited above, DSI's undisclosed interpretation that the language of Mod. M0001 divested AFNAFPO of its perpetual rights is irrelevant and will not be considered. We conclude that Mod. M0001 to Order 1375 did not serve to divest AFNAFPO of its perpetual right to use IBPS.

## CONCLUSION

Throughout the entire course of its contracts with AFNAFPO, DSI failed to disclose that DSI's interpretation of the language in the modifications was that it divested AFNAFPO of its perpetual right to use IBPS. The record is devoid of any evidence that AFNAFPO either knew of DSI's interpretation or would have agreed to it if it had. DSI's appeal is denied.

Dated:  4 August 2014

CRAIG S. CLARKE
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

JACK DELMAN
Administrative Judge
Acting Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 57266, Appeal of Distributed Solutions, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 22nd day of January, 2015, I caused this "Brief of Appellant" to be filed electronically with the Clerk of the United States Court of Appeals for the Federal Circuit using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Domenique Kirchner
United States Department of Justice
Commercial Litigation Branch
Ben Franklin Station
P.O. Box 480
Washington DC 20044

*Counsel for the Appellee*

Upon acceptance by the Clerk of the Court of the electronically filed document, the required number of copies of the Brief of Appellant will be hand filed at the Office of the Clerk, United States Court of Appeals for the Federal Circuit in accordance with the Federal Circuit Rules.

/s/ Thomas A. Coulter
*Counsel for Distributed Solutions, Inc.*

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Fed. R. App. P.
      28.1(e)(2) or 32(a)(7)(B) because:

      [ X ]  This brief contains [13,660] words, excluding the parts of the brief
      exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

      [    ] the brief uses a monospaced typeface and contains [*state the number
      of*] lines of text, excluding the parts of the brief exempted by Fed. R. App.
      P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P.
      32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6)
      because:

      [ X ]  This brief has been prepared in a proportionally spaced typeface using
      [*Microsoft Word 2010*] in [*14pt Times New Roman*]; or

      [    ] the brief has been prepared in a monospaced typeface using [*state
      name and version of word processing program*] with [*state number of
      characters per inch and name of type style*].

Dated:  <u>January 22, 2015</u>          <u>/s/ Thomas A. Coulter</u>
                                          *Counsel for Distributed Solutions, Inc.*